THE CAMDEN CONSOLIDATED OIL COMPANY *vs.* GUSTAV ADOLF SCHLENS and FREDERICK F. SCHLENS, trading as G. A. SCHLENS & CO.

*Contract to deliver goods—Breach of Contract—Measure of damages—Pleading—Legal right of Plaintiff to recover—Breach caused by Accident or design.*

In actions by vendee against vendor for breach of contract to deliver goods, the general rule is, that the measure of damages is the difference between the contract price and the market price at the time and place of delivery; but where an article is purchased, not for the domestic market, but to be shipped abroad, and the fact was shown on the face of the written contract and was known to the vendor, and it was impossible for the vendee to discover the inferiority of the article (which had been fraudulently substituted by the employés of the vendor) until it had reached its ultimate destination, the true measure of damages is the difference between the market price of the article contracted for, at the date of its arrival, and the price afterwards realized upon a sale thereof, together with the necessary and proper costs and expenses incurred in making the sale.

Where in an action by vendee against vendor for breach of contract to deliver goods, the damages claimed by the plaintiff are not in their nature *special*, but such as are the natural and proximate result of the breach, it is not necessary that they should be particularly stated in the declaration.

In an action by vendee against vendor for breach of contract to deliver goods—the breach being a failure to deliver the kind and quality of article contracted for—it is immaterial as to the legal right of the plaintiff to recover, whether the breach was caused by accident or design. It is not the less a breach, because the failure to deliver the article purchased, proceeded from the fraudulent acts of the defendant's agents.

APPEAL from the Superior Court of Baltimore City.

This suit was brought by the appellees against the appellant. The declaration contains the common counts in *assumpsit* and one special count, (the 7th,) which sets out a contract on the part of the appellant to sell and deliver to the appellees "twenty thousand barrels of refined petroleum, color to be standard white, or better, and which would burn at a test of one hundred and ten degrees Fahrenheit or upwards," and alleges as a breach that the defendant "failed and neglected to deliver the same." The defendant pleaded. 1st. "That it never was indebted as alleged." 2nd. "That it never promised as alleged." 3rd. "That it did perform all things required to be performed under the contract between it and the said plaintiffs," and issue was joined.

The evidence showed that the sale was made by written contracts; by which it appeared that there were three several contracts similar in their terms; one for a certain number of barrels more or less, enough to fill ship *Maryland,* one for enough to fill ship *Agra* and one for enough to fill ship *Wm. Woodbury.* In each it was stipulated that the petroleum was to be "*color standard white, or better. Burning test* 110 *degrees Fahrenheit or upwards.* Cash to be paid *on delivery in yard, suitable to vessel in Baltimore.*" The contracts were each subject to the "Rules of the New York Produce Exchange." Of these the 25*th Rule* was given in evidence, which provides: "Buyers shall have the right of naming their inspector, but shall do so at least five days before the maturity of the contract; failing in which, the sellers may employ, at buyers' expense, any regular petroleum inspector, approved by the committee on petroleum, and his certificate that oil is in conformity with the contract shall be accepted. On a contract for prompt delivery, or where no notice is required, buyers shall name their inspector when contract is executed; otherwise, sellers may appoint inspector, at buyers' expense."

Under these contracts refined petroleum was received at the warehouse and yard of the appellant, was there inspected by the inspector selected by the appellees, and by them certified to be in conformity with the contracts; the ships named were a short time thereafter loaded with petroleum at the yards or wharves of the appellant; and from the time the same was inspected until it was delivered at the ship's side, to be put on board, it remained in the custody and possession of the appellant. "The *Maryland*" began to load on the 6th of February 1877, finished on the 9th and cleared on the 10th. The "*Agra*" began to load on the 22nd February, finished on the 1st of March and cleared March 6th. The "*Woodbury*" began to load on the 9th of April, finished on the 19th and cleared on the 23rd. All bound for Bremen. The "*Agra*" was the first to arrive, she reached Bremerhaven on the 23rd of April 1877. Her cargo had been sold by the appellees' agents "to arrive." Soon after her arrival, as correctly stated in the appellees' brief, "the appellees were notified by telegram, that the portion of her cargo which was marked with the brand '*Franklin*' had been rejected by the purchaser, because its fire-test was below what the contract of sale called for, being about 60 degrees instead of 110 degrees. The same brand in the cargo of the '*Maryland*' was also unsaleable because it fell below 110 degrees fire-test; and by the time the '*Woodbury*' arrived, although what there was of the brand '*Franklin*' in her cargo, stood the fire-test of 110 degrees, yet the inferiority of that brand in the two previous cargoes had given it a bad name, so that it could not be sold, and it was accordingly stored at the risk and expense of the appellees; who however abandoned, at the trial below, all claim on account of the 'Woodbury's' cargo. All the other brands, except the 'Franklin,' which went to complete the cargoes, were in conformity with the contracts. When the appellees received the telegrams advising them of the rejection of

the oil on account of its inferior *fire-test*, they at once notified the appellant that they would hold it responsible for the loss. The only reply to this notification was 'that the sale was made subject to the rules of the New York Produce Exchange.'

"By the time the 'Agra' arrived, her cargo had been sold three or four times, and in order to prevent its rejection by the last buyer, and the consequent loss of the original sale, '*to arrive,*' the appellees instructed their agents in Bremen to repurchase it from the last purchaser, at the then market price of good oil, and afterwards sold it for the highest price it would bring. In the case of the '*Maryland,*' the inferior oil was rejected by the first purchaser, and was then sold by the appellees' agents for the most it would bring.

"Upon receipt of the telegrams announcing the rejection of the oil, as being below the fire-test required, the appellees sent the inspector, who had inspected the oil in Baltimore, and had certified that it was up to the required fire-test, to Bremen, to test it there, and the test there did not correspond with what he had certified to, being an average of a little over 98 degrees, instead of 110 degrees."

The cargo of the "Agra" was repurchased by the appellees' agents on the 2nd and 11th of May, and resold on the 18th of July; the "*Franklin*" oil in the cargo of the "Maryland" was sold July 18th.

The appellees claim to recover in this suit what they lost by reason of the failure of the appellant to deliver oil corresponding with the terms of the contracts, that is "the difference between the market price of oil of 110 degrees fire-test, at the date of its arrival, and what was realized from the inferior oil when sold."

*First Exception.*—This exception was taken to the admission of the evidence of the witness Misspach in reference to the alleged alteration of letters on the barrels of oil.

Camden Consolidated Oil Company *vs.* Schlens & Co.

*Second Exception.*—The plaintiffs offered the two following prayers:

1. If the jury believe from the evidence, that a quantity of oil of the "Franklin" brand was furnished by the defendant to the plaintiffs for inspection, as part of the cargoes of the ships "Agra" and "Maryland," respectively, to be shipped in said ships to some foreign port, under and in fulfilment on defendant's part of the contracts given in evidence, and that said oil was thereupon inspected by inspectors selected by the plaintiffs, and was certified by them to be of a fire-test of 110 degrees, and was accepted and paid for by plaintiffs upon and according to such certificate; and if the jury shall further find, that said oil, after such inspection and acceptance, was left in the custody of the defendant and that it was its duty to keep the same, and deliver it at the ship's side, on the wharf, for shipment, and that the same was not so delivered by defendant, but that certain other and inferior oil of the same brand, and below the fire-test of 110 degrees, was substituted and delivered by defendant, in its stead, to said ships, and was shipped accordingly, without any knowledge on the part of the plaintiffs of such substitution, then the plaintiffs are entitled to recover.

2. If the jury shall find the facts set forth in the plaintiffs' first prayer, and shall further find that the inferior substituted oil shipped on the "Agra" and "Maryland," or either of them, was found on arrival at Bremen, to be below 110 degrees fire-test, and was for that reason unsaleable at the market price of oil of 110 degrees fire-test, and had no market price or saleable value in the market at that time, and that the plaintiffs, before such arrival, had sold the same or any part thereof, to arrive, as oil of 110° fire-test, and were compelled on arrival, to take the same or any part thereof to their own account at the then market price of oil of 110 degrees, or to retain the same or any part thereof until it could be sold, and

that the plaintiffs afterwards sold the oil so taken or retained as speedily as it could be sold for the best attainable prices, and realized less therefrom than the market price on the arrival of said ships respectively of oil of 110 degrees fire-test, then the plaintiffs are entitled to recover the difference between the market price of oil of 110 degrees, on the respective days of arrival, and the price which they afterwards actually realized, together with all necessary and proper charges and expenses which the jury find that they were compelled to incur in so dealing with the oil, and the jury may, in their discretion, give interest upon the whole amount to which they may find that the plaintiffs are so entitled.

And the defendant offered the following six prayers:

1. That the plaintiffs are not entitled to recover upon the issues joined in this case on account of the oil supplied by the defendant for the cargo of the ship "Woodbury."

2. That if the jury find from the evidence that oil was supplied by the defendant to load the ships "Agra" and "Maryland," under the contracts offered in evidence, and that some of said oil was under the fire-test of 110° Fahrenheit, and that said oil was accepted by the inspector employed by the plaintiffs, after having had the opportunity to inspect the same as fully as he might have desired so to do, and that the said inferior oil was accepted through the neglect or carelessness of the inspector, and that the same was shipped on said vessels without fraud or deception on the part of the defendant or its officers or agents, their verdict must be for the defendant.

3. If the jury find from the evidence, that the defendant supplied oil to load the "Agra" under the contract offered in evidence, and that some of said oil was below the fire-test mentioned in said contract through the fraud of the agents of the defendant, and not for the reasons set forth in the defendant's second prayer, and if they further find, that the "Agra" arrived at Bremerhaven

on the 23rd day of April, 1877, and that the plaintiffs had sold her cargo, including the inferior oil, before its arrival, at a price above the market price at the date of its arrival, and that the purchasers of said defective oil had resold the same to others according to the certificate of fire-test furnished the plaintiffs, and that the last purchasers rejected said oil as being below said test, and that the plaintiffs upon being apprised of such rejection, repurchased a part of said inferior oil from the persons who had rejected it as aforesaid, on the 2nd of May, and another part thereof on the 11th of May, as testified to by the plaintiff, F. Schlens, and that the plaintiffs resold said oil, so repurchased by them, on the 18th of July, then the plaintiffs are not entitled to recover on the issues joined in this case, the difference between the amount paid by the plaintiffs to repurchase said oil, and the price at which they resold the same.

4. If the jury find from the evidence, that the defendant supplied oil to load the ship "Maryland," under the contract offered in evidence, and that part of the oil so supplied, was below the fire-test named in said contract, through the fraud of the agents of the defendant, and not for the reasons set forth in the defendant's second prayer ; and if they further find, that the cargo of the "Maryland" was sent by the plaintiffs to Bremerhaven, to be sold in the Bremen market, and that by an accident, her arrival at Bremerhaven was delayed, and that she arrived there on the 2nd of May, 1877, and that the same was sold on the 18th of July, then the plaintiffs are not entitled to recover, on the issues joined in this case, the difference between the price of said oil in Bremen at the time the "Maryland" reached Bremerhaven, and the price at the time said oil was sold, nor are they entitled to recover the difference between the market price of said oil in Bremen on the day it was sold, and the market price it would have brought on that day in Bremen, if it had been of the fire-test required by said contract.

5. If the jury find, that the defendant supplied oil below the fire-test required by the contracts offered in evidence, and that such inferior oil was put on board the "Agra" and "Maryland," through the fraud of the agents of the defendant, and not as set forth in the defendant's second prayer, then the measure of damages upon the issues joined in this case is the difference between the market price of said inferior oil in Baltimore at the time the same was supplied, but not less than the contract price and the market price said oil would have brought in Baltimore at that time, had the same been of the quality required by said contracts, and there is no evidence in the case from which the jury can find what the market price in Baltimore of said inferior oil was at the time the same was supplied, and in the absence of such evidence, the plaintiffs, if the jury find for them under this prayer, are only entitled to nominal damages.

6. That even if the jury find the facts stated in the two prayers of the plaintiffs, the plaintiffs are not entitled to recover upon the issues joined in this case.

The plaintiffs specially excepted to the third and fourth prayers of the defendant, because they and each of them assumed that there was evidence in the case tending to show that the "Franklin" oil, which arrived at Bremerhaven in the ships "Agra" and "Maryland," or either of them, had a market price on arrival, which market price continued to decline until the times when said "Franklin" oil was finally sold. Whereas, there was not only no evidence tending to prove said facts or either of them, but the entire evidence in the cause, upon the said points, was directly to the contrary of the facts assumed.

The defendant excepted specially to the prayers of the plaintiffs, because said prayers assumed that there was evidence of a substitution of rejected or inferior oil for accepted oil in the case of the cargo of the ship "Maryland," of which fact no evidence had been offered.

Camden Consolidated Oil Company *vs.* Schlens & Co.

The Court (GILMOR, J.) granted the plaintiffs' prayers, as also the first and second prayers of the defendant, but rejected its other prayers. The defendant excepted, and the verdict and judgment being for the plaintiffs, this appeal was taken.

The cause was argued before BARTOL, C. J., STONE, GRASON, MILLER, ALVEY, ROBINSON, IRVING and RITCHIE, J.

*R. W. Cull,* and *Charles Marshall,* for the appellant.

*Henry C. Kennard,* and *Severn Teackle Wallis,* for the appellees.

BARTOL, C. J., after stating the case, delivered the opinion of the Court.

In the progress of the trial below, evidence was offered by the plaintiffs, for the purpose of proving that after the oil had been inspected and approved, and before it was delivered at the ships' side, certain agents or employés of the defendant substituted in its place, other and inferior oil, which was put on board the ships without the knowledge of the plaintiffs; and in their *first prayer,* which was granted, the plaintiffs placed their right to recover upon the finding by the jury of the fact that such inferior oil had been so substituted and delivered in the place of that which had been inspected and approved.

Several objections were made to this evidence, which will now be considered.

It is contended *first,* that the testimony offered for that purpose was too vague, uncertain and inconclusive to be submitted to the jury; and special exception was taken to the *first prayer* of the plaintiffs upon the ground of want of evidence to support its hypothesis, in the particular mentioned.

It was established by uncontradicted proof, that petroleum does not deteriorate during a voyage, but that the

effect of a sea voyage is to inprove its quality, or fire-test. The certificate of the inspectors showed that the "Franklin" oil, inspected by them in Baltimore, was of the standard of 110 degrees, and the oil of that brand, when inspected after the voyage, fell below that standard. This could only have resulted either from a bad inspection or a false or erroneous delivery. If from the former cause, the plaintiffs were not entitled to recover, and so the jury were instructed by the defendant's *second* prayer, which was granted. In addition to the fact of the inferiority of the "Franklin" oil, shipped by the "Agra" and the "Maryland," when tested in Bremen, testimony was offered showing that the marks upon certain barrels, were altered by means of stencils cut from paste-board, by which the letter "D," that indicated oil of 110 degrees, had been substituted for the letter "C," which indicated rejected oil, or such as had been marked by the inspectors as below the test of 110 degrees.

The witnesses who testified on this subject were *Freeland, Misspach* and *Hauf.* The oils were inspected by Smith who represented the firm of Harrison & Smith, oil inspectors; *Freeland* and *Misspach* were their assistants. *Freeland* testified that all the oil of the Franklin brand, that had been inspected and approved by him, was of the fire-test of 110 degrees. He stated that after the oil had been inspected "there was something occurred; there were some barrels that had their letters changed—their refining letter changed from an off-test letter, to one that was good."

"It was changed between the time the ship stopped at 12 o'clock—the dinner hour; *Mr. Misspach* and myself were walking down together, and we noticed these barrels with the refiner's letter on the head turned one way; well it created a suspicion, and we took the trouble to go on the other side of the tram-way as we call it—it is like a railroad track—and rubbed our hands over the letter, and out came the letter that was rejected, that had been off-test." "A

letter had been put on top of that, in other words the marks had been changed." "We ascertained this by rubbing our hands over it; the lamp-black they had made the letters with rubbed off, and disclosed the rejected letter."

The witness was not able to state when this occurred; except that it was in the year 1877.

*Misspach,* the superintendent, testified to the same fact as Freeland, with regard to the change of letters on certain barrels from C. to D. He could not say whether these alterations were made in barrels of the cargo intended for one or the other of the three vessels.

*Hauf,* the other witness, a cooper employed by the defendant, said: "The letters were changed with my own pocket knife; my own pocket knife done it." "The day, I can't recollect exactly the time, the rejected oil was lying on the right hand side going down to the warehouse; on the left hand side I was at work; the oil was lying where I was working, on the left hand side, going down to the wharf, the rejected oil was all on the right, and McIldew, he came to me and asked me for my pen-knife; I asked him what he wanted with it, he said he wanted to cut some letters out, and so he did, and he cut them out of a thick piece of paste-board: he cut the letters out and Tom Wall and Jim Cunningham they put it on." (McIldew, Wall, and Cunningham were employés of the defendant.)

The witness stated on cross-examination, that this occurred in the Spring of 1877, he forgot whether it was in March or April. He was asked, do you know which one of these vessels it was that this cargo went aboard of? He said "I think there was three of them, I think the *'Agra'* got this oil, I think it was the time she was loading." He further stated, "There were several hundred altered in that way, could not tell exactly, there were 5 or 6 or 700."

Gustav A. Schlens testified that when their claim for compensation was presented by him and his partner to Mr. Camden, the president of the defendant, the latter

said, "Gentlemen, I am very sorry that the boys gave you the wrong oil, but I am not the only one to decide about compensation, I have to see my friends in New York about it."

In our opinion, this testimony, when taken together with that of *Freeland*, *Misspach* and *Hauf*, justified the submission to the jury of the question, whether inferior oil had been substituted in the place of that which had been inspected and approved, and had been put on board the ships "*Agra*" and "*Maryland*."

It was further objected that this evidence was inadmissible under the pleadings, because its purpose and effect were to charge the defendant with the commission of a fraud, which was not alleged in the declaration; and to change the character of the suit, from an action for a breach of contract, to an action of *tort*. But it seems to us this objection is not valid. The breach of the contract in failing to deliver oil of the kind and quality required by the contracts, is established by proving that such oil was not delivered, and that an inferior article was delivered instead. It can make no difference whatever, in the legal right of the plaintiffs to recover, whether such breach was caused by accident or design. It is not the less a breach of the contract alleged in the declaration, because the failure of the defendant to deliver the article purchased, proceeded from the fraudulent acts of the defendant's agents.

The *first* prayer of the plaintiffs is further objected to, because, as contended by the appellant, the contract set out in the prayer, the breach whereof is therein stated as the cause of action, is a different contract from that stated in the declaration.

The prayer submitted to the jury to find "that the oil had been inspected by inspectors selected by the plaintiffs, and was certified by them to be of the fire-test of 110 degrees, and was accepted and paid for by the plaintiffs,

upon and according to such certificate," and "that said oil, after such inspection and acceptance, was left in the custody of the defendant, and it was its duty to keep the same and deliver it at the ship's side on the wharf for shipment, and that the same was not so delivered by the defendant, but that certain other and inferior oil of the same brand, and below the fire-test of 110 degrees, was substituted and delivered by defendant in its stead, &c. &c. then the plaintiffs are entitled to recover."

Now the argument on the part of the appellant is that the prayer states a contract of *bailment*, and seeks to recover for a breach thereof; whereas the *seventh* count of the declaration sets out a contract of sale and alleges a breach thereof in failing to deliver."

In order to determine the weight of this objection, we must refer to the contracts offered in evidence, and the testimony in this case, showing the course and manner in which the business was conducted. By the written contracts, the appellant was bound to deliver the oil "*in yard suitable to vessel in Baltimore.*" The meaning and legal effect of this was to impose upon the defendant the duty of delivering the oil at the ship's side. When received at the warehouse of the defendant, the purchasers were notified, and under the *Rule* before referred to, it was the duty of the latter to name their inspectors, who proceeded to inspect the oil in the warehouse. Upon their certificate that the same was of the quality required, the further duty of the defendant was to deliver the oil, thus inspected and approved, at the ship's side; until that was done, the delivery of the goods under the contract was not complete. It was all one continuous transaction. If after the inspection, by any fault of the defendant, the oil specified in the contract was not delivered at the ship's side, there was a breach of the original contract to deliver; and not as the appellant contends, a breach of another and distinct contract of *bailment.*

The *second* prayer of the appellees was also granted, and instructed the jury that the measure of damages was, "the difference between the market price of oil of 110 degrees, on the respective days of arrival, and the price which the plaintiffs afterwards actually realized, together with all necessary and proper charges and expenses, which the jury find that they were compelled to incur, in so dealing with the oil, and the jury may, in their discretion, give interest upon the whole amount, to which they may find that the plaintiffs are entitled."

In actions by vendee against vendor for a breach of a contract to deliver goods, the general rule is that the measure of damages is the difference between the contract price and the market price, at the time and place of delivery. 1 *Chitty on Contracts,* 621; 1 *Sedgwick on Damages,* 552; *Williamson vs. Dillon,* 1 *H. & G.,* 445; *Williams vs. Woods, Bridges & Co.,* 16 *Md.* 222.

The application of this rule ordinarily secures to the injured party indemnity or compensation for the loss arising from the breach of the contract, which is the true principle upon which damages are estimated in civil suits; and the reason for the rule is that it is ordinarily in the power of the vendee to go into the market and purchase goods of the same quality at the market price.

But this general rule is not applicable to all cases, and it is obvious that to apply it to the present case, would cause the greatest injustice.

The oil was not purchased for the domestic market, but to be shipped abroad, and this fact was shown on the face of the written contracts, and was known to the defendant. The breach did not consist in a failure to deliver the quantity of oil purchased, in Baltimore, but in failing to deliver oil of the quality purchased; that which was delivered being in close packages and placed on board the ships for transportation, it was impossible for the plaintiffs to discover the inferiority of the article until it had reached

its ultimate destination. In such case, the market price in Baltimore could furnish no correct standard for estimating the damages suffered by the plaintiffs.

In the leading case of *Hadley vs. Baxendale,* 9 *Exch.,* 341, it was laid down that "the damages for a breach of a contract should be such as may fairly and reasonably be considered, either as arising naturally, *i. e.* according to the usual course of things from such breach of the contract itself; or such as may reasonably be supposed to have been in contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."

In *Abbott vs. Gatch,* 13 *Md.,* 333, the rule was thus stated: "Such damages as are incidental to, and caused by the breach, and may be said to flow reasonably and naturally from such breach, and are not accidental or *consequential (quære, contingent,)* losses will be allowed, and whether they are of the one character or the other must depend on the nature of the transaction." Applying this rule to the present case, we think the measure of damages laid down in the appellees' *second prayer* was correct. The inferior oil having no market price at Bremerhaven when it arrived, and being then unsaleable, the plaintiffs were entitled to dispose of the same, with reasonable diligence, for the best price they could obtain, and the difference between the price thus realized and the market price of the oil contracted for, would be the measure of their damages, and they were also entitled to recover the necessary and proper costs and expenses incurred by them in so dealing with the oil.

In support of these conclusions we refer to *Borries, &c. vs. Hutchinson,* 114 *Eng. C. L.,* 443 : *Elbinger, &c. vs. Armstrong, L. R.,* 9 *Q. B.,* 476 ; *Hinde vs. Liddell, L. R.,* 10 *Q. B.,* 269 ; *Loder vs. Kekule,* 3 *C. B., N. S.,* 128, (91 *E. C. L. R.;*) 1 *Sedgwick on Damages,* 223, 236, 237, 586 *n.*

The damages claimed by the plaintiffs, not being in their nature *special;* but such as were the natural and proxi-

mate result of the breach, it was not necessary that they should be particularly stated in the declaration. 1 *Chitty Pl.*, 348; 1 *Sedgwick on Damages*, 101, 103; *Armstrong vs. Percy*, 5 *Wend.*, 538.

It follows from what has been said in considering the *first* and *second* prayers of the appellees, that the *third, fourth, fifth* and *sixth* prayers of the appellant were properly refused.

*Judgment affirmed.*

