916 A.2d 257

Timothy and Bernadette LLOYD, et al.

v.

GENERAL MOTORS CORPORATION, et al.

No. 10, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 8, 2007.

Reconsideration Denied March 14, 2007.

112

114

John M. Mason (Marks & Sokolov, LLC, Philadelphia, Law Offices of William F. Askinazi, William F. Askinazi, Potomac, Stephen H. Ring, Stephen H. Ring, P.C., Germantown, all on briefs), for petitioners.

John H. Beisner (Neil K. Gilman, Jonathan D. Hacker, Goodwin Liu, O'Melveny & Myers LLP, Washington, DC, Karen N. Walker, Kirkland & Ellis, Washington, DC, J. Andrew Langan, Douglas M. Poland, Chicago, IL, Richard E. Hagerty, Troutman Sanders, LLP, McLean, VA, Charles A. Newman, Kathy A. Wisniewski, Veronica A. Gioia, Bryan Cave LLP, St. Louis, MO, all on brief), for respondents.

Michael T. Wharton, Victoria H. Wink, Wharton Levin Ehrmantraut & Klein, P.A., Annapolis, amicus curiae;

Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, VA, of counsel.

Argued before BELL, C.J.,*ELDRIDGE, RAKER,* WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

The major issue in this case is whether the cost to repair defective seatbacks, which allegedly have a tendency to collapse in rear-impact collisions, causing, in some cases, serious bodily injury or death to drivers and/or passengers in the class vehicles, constitutes a cognizable injury, in the form of economic loss for claims sounding in tort, contract, and consumer protection.

Inconsistent with the conclusion reached by the Circuit Court for Montgomery County and the Court of Special Appeals, we shall hold that the petitioners, Timothy and Bernadette Lloyd, have sufficiently alleged an injury that is cognizable under each of the petitioners' claims. Accordingly, we shall reverse the judgment of the Court of Special Appeals dismissing the petitioners' claims.

## I.

The petitioners are Timothy and Bernadette Lloyd and seven other Maryland residents, who own "class vehicles," automobiles manufactured between 1990 and 1999 by the respondents, General Motors Corporation, Ford Motor Company, Daimler Chrysler Corporation and Saturn Corporation. The petitioners brought this class action to recover from the respondents the cost of repairing and/or replacing the front seats in each class vehicle. They allege that the seats are

---

* Eldridge and Wilner, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

unsafe because they collapse rearward in moderate and severe rear-impact collisions. None of the petitioners or any putative class members allege that he or she has experienced personal injury as a result of the mechanical failure that caused the alleged defect. Indeed, persons with such experiences were expressly excluded from this class.[1]

The Third Amended Complaint ("TAC") contains seven counts. Count one alleges negligence in the design and manufacture of the seats. Count two, sounding in strict liability, alleges that the seats were in a defective condition, rendering them "inherently dangerous and creating an unreasonable risk of serious injury or death to users" when they left the control of the defendants. Count three alleges breach of the implied warranty of merchantability. Count four alleges negligent failure to disclose, failure to warn, concealment and misrepresentation. Count five alleges fraudulent concealment and intentional failure to warn. Count six alleges unfair or deceptive trade practices under the Maryland Consumer Protection Act (CPA). Count seven alleges civil conspiracy.

Significant to the case *sub judice,* the TAC sets forth the following allegations of fact:

"27. Each year more than a thousand people die and many thousands more are injured in rear-impact motor vehicle collisions in the U.S. Some of these people are Maryland residents.

"29. The Defect has resulted in significant numbers of serious injuries including paraplegia, quadriplegia and death to occupants of Class Vehicles struck in rear-impact collisions.

"31. All Seats have the Defect.

---

1. The Third Amended Complaint defines "The Class" as:

"all Maryland residents who own a Class vehicle, excluding i) all persons or entities who have already commenced an individual civil action based on the product defects alleged in this suit, ii) all persons who have suffered personal injury as a result of the rearward collapse of a Seat, iii) the officers, directors agents, controlled persons, servants or employees of Defendants; and iv) members of the immediate families of all persons covered in iii) above."

"32. It is highly predictable that a certain percentage of occupants of Class Vehicles will be killed or seriously injured in rear-impact motor vehicle collisions each year in the U.S., and that some of those killed or injured will be Class Members.

"33. The automobile seat is the single most important life-saving device in an automobile in the event of a crash.

"36. The inclusion of properly designed dual recliner mechanisms greatly increases the resistance to rearward collapse of the backrest, and minimizes injury to the occupants.[ ]

"40. The Seats are unreasonably unsafe in moderate and severe rear-impact collisions because they are so weak they deform and/or collapse rearward, allowing the occupant to slide or ramp up the seatback and suffer hyper extension of the spine over the top of the Seat, or to be hurled into the rear seat area. The latter event can result in injuries not only to the occupant who is hurled back, but also to those already seated in the rear of the vehicle, including children in safety seats positioned as recommended by the manufacturer. Additional hazards caused by Seat collapses include: 1) the loss of vehicle control when the driver is unable to reach pedals or hand controls, and 2) delayed escape from the vehicle in the event of fire."

The petitioners filed this suit in the Circuit Court for Montgomery County. Before the petitioners filed pleadings seeking certification of a class, the respondents moved, pursuant to Maryland Rule 2–322(b),[2] to dismiss the complaint for failure to state a claim upon which relief could be granted.

---

**2.** Maryland Rule 2–322(b), governing Preliminary Motions, provides:
"(b) Permissive. The following defenses may be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the subject matter, (2) failure to state a claim upon which relief can be granted, (3) failure to join a party under Rule 2–211, (4) discharge in bankruptcy, and (5) governmental immunity. If not so made, these defenses and objections may be made in the answer, or in any other appropriate manner after answer is filed."

The trial court granted the motion, holding that "the economic loss doctrine would not support the cause of action being sought by the plaintiffs in this case, and there is insufficient basis to allow a fraud claim to continue against these defendants."

The petitioners noted an appeal to the Court of Special Appeals. In an unreported opinion, that court affirmed the dismissal of the action. It reasoned that, for each claim, the petitioners failed to plead sufficiently the required allegation of injury or actual harm to withstand a motion to dismiss. The intermediate appellate court also held that the petitioners failed to plead the fraud and conspiracy claims sufficiently, characterizing the allegations as "vague, confused, and extremely ambiguous" and, as well, as supported by insufficient facts.

The petitioners filed a petition for Writ of Certiorari, which we granted. *Lloyd v. GM*, 369 Md. 179, 798 A.2d 551 (2002). The petitioners urge this Court to reverse the judgment of the Court of Special Appeals, which, they argue, is erroneous for failing to conclude that the cost to class members to fix the defective seatbacks, a proven cause of serious bodily injury or death in rear-collision accidents, constituted a cognizable injury. More particularly, the petitioners aver that such required remedial expenditures constitute economic loss, which this Court has permitted to be recovered when the product defect factor creates an unreasonable risk of death or serious injury. That economic loss, the petitioners submit, is recoverable under each of the substantive legal counts alleged in the Third Amended Complaint, including those alleging violation of the Consumer Protection Act, breach of warranty, fraud, and conspiracy.

The respondents do not agree. They argue that the Circuit Court and the intermediate appellate court ruled correctly. They submit that the petitioners have not stated a cognizable injury, which they must do in order to recover under the claims asserted in the Third Amended Complaint. Specifically, the respondents deny that the petitioners have suffered

actual harm to person or property or experienced product malfunction as a result of the product defect, and thus, they contend, the damages sought by the petitioners are simply speculative. The respondents also argue that the petitioners failed to argue in their Petition for Certiorari that the Court of Special Appeals erred in dismissing the fraud and civil conspiracy claims and, therefore, have waived the right to raise the issue before this Court. In any event, the respondents assert, in accordance with the holding of the Court of Special Appeals, that the petitioners did not plead the fraud and conspiracy claims with sufficient particularity to state a cognizable claim.

## II.

Upon review of a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a court must "assume the truth of all well-pleaded facts and allegations in the complaint, as well as all inferences that can reasonably be drawn from them," *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624, 630 (1995), and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action. *A.J. Decoster Co. v. Westinghouse,* 333 Md. 245, 249, 634 A.2d 1330, 1332 (1994). See also *Sharrow v. State Farm Mutual Ins. Co.,* 306 Md. 754, 768, 511 A.2d 492, 499–500 (1986), in which we stated the rule as follows: "[I]n considering the legal sufficiency of [a] complaint to allege a cause of action for tortious interference, we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." Mere conclusory charges that are not factual allegations may not be considered. *Morris, supra,* 340 Md. at 531, 667 A.2d at 631, *Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327, 331 (1993). Moreover, in determining whether a petitioner has alleged claims upon which relief can be granted, "[t]here is . . . a big difference between that which is necessary to prove the [commission of a tort] and that which is necessary merely to allege [its commission],"

*Sharrow supra,* 306 Md. at 770, 511 A.2d at 500, and, when that is the issue, the court's decision does not pass on the merits of the claims; it merely determines the plaintiff's right to bring the action. *Figueiredo–Torres v. Nickel,* 321 Md. 642, 647, 584 A.2d 69, 72 (1991). Furthermore, the court must view all well-pleaded facts and the inferences from those facts in a light most favorable to the plaintiff. *Board of Education v. Browning,* 333 Md. 281, 286, 635 A.2d 373, 376 (1994).

### III.

Traditionally, damages in products liability cases have been categorized as "(1) personal injuries, (2) physical harm to tangible things, and (3) intangible economic loss resulting from the inferior quality or unfitness of the product to serve adequately the purpose for which it was purchased." *A.J. Decoster Co. v. Westinghouse,* 333 Md. 245, 249–50, 634 A.2d 1330, 1332 (1994) (*citing* W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 101 at 707–08 (5th ed.1984)). The latter of these damages, and the one with which we are concerned in the instant matter, is economic loss. *U.S. Gypsum Co. v. Mayor and City Council of Baltimore,* 336 Md. 145, 156, 647 A.2d 405, 410 (1994). Such loss occurs when a purchaser suffers loss of value or use of the product, and has absorbed, or will absorb, the cost to repair or replace the product, or has lost or will lose profits resulting from the loss of use of the product. *Id., citing* WILLIAM L. PROSSER, THE LAW OF TORTS § § 101, at 665 (4th ed.1971); Comment, *Manufacturer's Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?,* 114 U. Pa. L.Rev. 539 (1966). Ordinarily, such damages are not allowed in tort actions. *Id.*

The petitioners in the matter *sub judice* aver that they were damaged because they incurred a loss in the form of the cost of replacing the faulty seatbacks. We shall examine the propriety of the intermediate appellate court's affirmance of the trial court's dismissal of the petitioner's claims.

## A. Tort Claims

■ Ordinarily, as noted, *supra,* damages for economic loss are not available in a tort action and are recoverable, if at all, in contract causes of action and, in the case of fraud, in actions for deceit. *Gypsum,* 336 Md. at 156, 647 A.2d at 410. We have explained the rationale for this general rule:

"The distinction between tort recovery for physical injury and warranty recovery for economic loss derives from policy considerations which allocate the risks related to a defective product between seller and the purchaser. A manufacturer may be held liable for physical injuries, including harm to property, caused by defects in its products because it is charged with the responsibility to ensure that its products meet a standard of safety creating no unreasonable risk of harm. However, where the loss is purely economic, the manufacturer cannot be charged with the responsibility of ensuring that the product meet [sic] the particular expectations of the consumer unless it is aware of those expectations and has agreed that the product will meet them. Thus, generally, the only recovery for a purely economic loss would be under a contract theory."

*Decoster, supra,* 333 Md. at 250–51, 634 A.2d at 1333(citing Keeton et al., supra § 101 at 708 (5th ed.1984) and Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917 (1966)). There is an exception to the general rule, however: "Even when a recovery, based on a defective product, is considered to be for purely economic loss, a plaintiff may still recover in tort if this defect creates a substantial and unreasonable risk of death or personal injury." *Gypsum,* 336 Md. at 156–57, 647 A.2d at 410.

This Court adopted this exception, an increasingly popular view, in *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 25, 517 A.2d 336, 345. (1986). There, we recognized that, in limited circumstances, those in which a product defect presents a substantial, clear and unreasonable risk of death or personal injury, it is inappropriate to draw a distinction

"between mere 'economic loss' and personal injury....
When one is personally injured from a defect, he recovers
mainly for his economic loss. Similarly, if a wife loses a
husband because of injury from a defect in construction, the
measure of damages is totally economic loss. We fail to see
any rational reason for such a distinction."

*Id.*, at 25, 517 A.2d at 345. (1986) (*quoting Barnes v. Mac
Brown and Company,* 264 Ind. 227, 342 N.E.2d, 619, 621
(1976)). See also, *Drexel Properties, Inc. v. Bay Colony Club
Condominium, Inc.,* 406 So.2d 515 (Fla.Dist.Ct.App.1981) rev.
denied 417 So.2d 328 (Fla.1982), *Barnes v. Mac Brown and
Co.,* 264 Ind. 227, 342 N.E.2d 619 (1976); *Kristek v. Catron,* 7
Kan.App.2d 495, 644 P.2d 480 (1982); *Juliano v. Gaston,* 187
N.J.Super. 491, 455 A.2d 523 (1982) *cert. denied,* 93 N.J. 318,
460 A.2d 709 (1983); *Quail Hollow East Condominium Assoc.
v. Donald J. Scholz Co.,* 47 N.C.App. 518, 268 S.E.2d 12 *review
denied,* 301 N.C. 527, 273 S.E.2d 454 (1980); *Terlinde v.
Neely,* 275 S.C. 395, 271 S.E.2d 768 (1980); *A.E. Investment
Corp. v. Link Builders, Inc.,* 62 Wis.2d 479, 214 N.W.2d 764
(1974).

■ Thus, in order to assert a cognizable products liability
theory of recovery, an action sounding in tort, but one prem-
ised on economic loss alone, the plaintiff must allege facts that
demonstrate that the product at issue creates a *dangerous
condition,* one that gives rise to a *clear danger of death or
personal injury.* *Whiting–Turner* 308 at 27, 517 A.2d at 345.

In *Whiting–Turner,* the appellants, residents and the Coun-
cil of Unit Owners of the Atlantis Condominium, a twenty-one
story condominium building, brought an action, in tort, alleg-
ing that the appellees, the general contractor, developer and
architects involved in the planning, inspection and construction
of the building, failed to construct "ten vertical utility shafts
with materials having a fire resistance rating of two hours," as
the applicable building code required. Id. at 22, 517 A.2d at
338. As a result of the defect, the appellants claimed that
there was "a threat to the safety and welfare of the owners
and occupants of the [condominium] and to the personal and

real property of the owners and occupants." *Id.* The appellees demurred, arguing, inter alia, that, because the appellants failed to allege actual personal injury or property damage, they could not " 'be liable in tort to [appellants] for purely economic loss.' " *Id.* at 24, 517 A.2d at 339.

The Circuit Court for Worcester County sustained the appellees' demurrer and granted the appellees' subsequently filed motion for summary judgment. The court reasoned that the appellants had no cause of action in tort against the appellees due to lack of privity between the parties [3] and because the appellees owed no duty to the appellants when the latter claimed only economic loss. *Id.* at 24, 517 A.2d at 339.

This Court reversed. We concluded that the issue of whether a duty will be imposed in tort depends upon the "risk generated by the negligent conduct." *Id.* at 35, 517 A.2d at 345. The Court explained that a plaintiff should not "have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects[.] In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition." *Id.* at 35, 517 A.2d at 345. If, therefore, the conduct complained of creates a risk of death or personal injury, this Court continued, "the action will lie for recovery of the reasonable cost of correcting the dangerous condition in a tort action seeking purely economic loss." *Id.* at 35, 517 A.2d at 345. The Court explained:

"it is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury.

---

**3.** In addition, to their economic loss argument, the appellees contended that they owed no duty to the appellants, there being no privity between them and, thus, the allegations of negligence were insufficient to withstand a motion to dismiss. Although the Circuit Court for Worcester County accepted the argument, grounding its ruling in the appellees' favor partially on that basis, this court rejected it, holding that privity was not an absolute requirement to a finding of duty when the appellees' exercise of care in inspecting and constructing the condominium shafts "foreseeably subjected to the risk of personal injury . . . a latent and unreasonably dangerous condition resulting from their negligence." *Whiting–Turner,* 308 Md. at 21–22, 517 A.2d at 343–44.

Accordingly, conditions that present a risk to general health, wealth, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient."

*Id.* at 35 n. 5, 517 A.2d at 345 n. 5. Accordingly, given the serious risk of death or serious bodily injury that resulted from the appellee's failure to construct sufficiently fire-worthy utility shafts, this Court held that the appellants had asserted a cognizable negligence claim against the appellees. *Id.* at 40–41, 517 A.2d at 348.

*U.S. Gypsum Co. v. Mayor and City Council of Baltimore,* 336 Md. 145, 157–58, 647 A.2d 405, 411 (1994), is to like effect. There, the City of Baltimore filed a claim, seeking, inter alia, recovery in tort for the cost of "discovering, managing, rectifying the effects of, and removing ... asbestos-containing building material." *Id.* at 156, 647 A.2d at 410. Relying on the exception to the general bar to recovery for economic loss in tort " 'where the risk is of death or personal injury,' " *id.* (*quoting Whiting–Turner,* 308 Md. at 35, 517 A.2d at 345), this Court agreed that the City's allegations met the threshold set forth in *Whiting–Turner.* It held, therefore, that Gypsum should be responsible for the cost to the City of removing the hazard. *Id.* at 157–158, 647 A.2d at 411. In so holding, we noted the great likelihood that those exposed to the asbestos-containing material in the City building would suffer serious injury in the event that it was not abated.

This Court further explicated the application of the exception to the economic loss rule in *Morris v. Osmose,* 340 Md. 519, 667 A.2d 624 (1995). In *Morris,* the appellants sought to recover purely economic loss associated with the alleged deterioration of flame retardant treated (FRT) plywood used in the construction of the roofs of their townhouses. *Id.* at 526–27, 667 A.2d at 628–29. The appellants argued, in particular, that a chemical reaction, which occurred when FRT plywood was exposed to moderately high temperatures, weakened the wood and the bonding between the planks. Id. As a result,

the appellants asserted that " 'the roofs are unsafe and dangerous' and 'at risk of premature failure' " *Id.* at 527, 667 A.2d at 629. They further [asserted] that " 'there is an immediate threat of injury from walking on the roofs, and also the threat of the roofs collapsing and injuring the occupants within,' and that the roofs cannot support 'any weight, even a heavy snowfall.' " *Id.* The appellants did not allege, it is to be noted, that any person had ever been injured as a result of the allegedly defective FRT firewood. *Id.* at 536, 667 A.2d at 633. *Inter* alia, the appellants asserted claims sounding in negligence and strict liability,[4] believing that the threat of serious injury or death presented by the faulty roofs was serious enough, under *Whiting–Turner,* to warrant recovery for the economic loss associated with replacing the roofing. *Id.* 340 Md. at 528, 667 A.2d at 629.

The trial court dismissed the complaint. With regard to the allegations in the tort claims, it reasoned that the appellants had not alleged "a clear danger of physical injury or death" as is required to make cognizable a claim for recovery of purely economic damages in tort. The trial court explained that "at the time of the sale by defendants to the developers, the FRT plywood was not so defective as to present a clear and imminent danger of death or personal injury to the ultimate purchaser of the home." *Id.* 340 Md. at 529, 667 A.2d at 630.

The Court of Special Appeals reversed the trial court's dismissal with regard to the implied warranty claim, but affirmed the dismissal of all the other counts, including the tort claims. Regarding those latter claims, the intermediate appellate court held that the risk of serious injury or death, as alleged by the appellants, amounted to "[m]ere possibilities ... [that did not] meet the threshold of establishing a clear danger of death or personal injury." *Id.* 340 Md. at 531, 667 A.2d at 630.

---

**4.** The appellants also asserted a right to recovery under claims of breach of implied warranty, negligent misrepresentation, and violation of the Maryland Consumer Protection Act.

On certiorari to this Court, the appellants reiterated their argument that, under the exception to the economic loss rule in tort enunciated in *Whiting–Turner,* the risk of serious injury or death from FRT treated plywood was sufficient to assert a claim for the recovery of monies spent to repair the roofs. *Id.* 340 Md. at 533, 667 A.2d at 631. The appellees argued that the risk of serious injury or death was not sufficiently clear as to invoke the exception. *Id.*

We agreed with the appellees and the Court of Special Appeals. *Id.* at 37, 517 A.2d 336. Affirming the dismissal of the appellant's tort claim,[5] we explained that, in order to determine whether a valid tort claim exists under the exception to the economic loss rule, the court must "examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury." *Id.* 340 Md. at 533, 667 A.2d at 631–32. Furthermore, we expounded on the logic of this two-part approach, *vis-a-vis* the general rule barring recovery in tort for economic losses:

"This two part approach recognizes the negative effects that could occur if the economic loss rule was abandoned. See *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 870–71, 106 S.Ct. 2295[, 2301,] 90 L.Ed.2d 865[, 876] (1986), (stating that an approach rejecting the economic loss rule 'fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages'). It balances these considerations, however, against the public policy of encouraging people to correct dangerous conditions before tragedy results. Accordingly, we do not ordinarily allow tort claims for purely economic loss. But when those losses are coupled with serious risk of death or personal injury resulting

---

**5.** Although we agreed with the Court of Special Appeals, in dismissing the appellants' tort and Consumer Protection Act claims, we reversed that court's holding that the appellants' stated a sufficient claim for breach of implied warranty against the plywood manufacturers. *Morris* at 546, 667 A.2d at 638.

from a dangerous condition, we allow recovery in tort to encourage correction of the dangerous condition."

*Morris*, 340 Md. at 534–35, 667 A.2d 624, 632.

We also explained that, when analyzing the two elements, the critical test is not whether the plaintiff has alleged facts that meet an articulable threshold for both elements, but, rather, whether that plaintiff has met the threshold to satisfy *either* of the elements so long as, under the facts alleged, both elements are, at a minimum, present. *Id.* at 533–34, 667 A.2d at 631–32.

"Thus, if the possible injury is extraordinarily severe, i.e., multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, i.e. a broken leg or damage to property. Likewise, if the probability of the injury occurring is extraordinarily high, we do not require the injury to be as severe as we would if the probability of the injury were lower."

*Id.* 340 Md. at 533, 667 A.2d at 632. To illustrate, we referred to *Whiting–Turner,* which primarily concerned the potential severity of the injuries that would be incurred as a result of the appellees' failure to construct the condominium with the requisite fire-worthy support shafts. *Id.* at 533–34, 667 A.2d at 632. This Court pointed out that, even though, in *Whiting–Turner,* "no fire had actually occurred and the probability that the defect would cause the fire was not extraordinarily high, we allowed the plaintiffs to maintain a tort action because the nature of the possible damage was very serious—multiple deaths and personal injuries." *Id.* See also *U.S. Gypsum Co. v. Mayor & City Council of Baltimore,* 336 Md. 145, 156–57, 647 A.2d 405, 410–11 (1994), in which the Court recognized a tort claim against companies involved in the manufacture, distribution and installation of asbestos in Baltimore City buildings because the "possible injury—inhalation of asbestos fibers causing serious diseases—was coupled with a high probability that personal injuries thereby would result because

everyone who used the building could have been exposed to asbestos fibers in the air."

Turning to the facts of the case before it, this Court held that the factors that persons who walk on the roofs may *potentially* suffer injury in the event that the roofs collapsed, or that the roofs might collapse under any significant pressure, such as a heavy snowfall, failed to meet the threshold for either element of the exception to the economic loss analysis enunciated in *Whiting–Turner* and its progeny. *Id.,* 340 Md. at 536, 667 A.2d at 633 (1995). We reasoned that the appellants made "no allegation that any injury has ever occurred since the roofs were installed on the plaintiff's townhouses ... or that any of the roofs have collapsed because of weather conditions or because of the alleged degradation associated with their construction. As noted by the Court of Special Appeals, mere possibilities are legally insufficient to allege the existence of a clear danger of death or serious personal injury." *Id.*

■ Applying the thresholds established in *Whiting–Turner, Gypsum,* and *Morris,* we disagree with the intermediate appellate court, that the appellants in the case *sub judice* asserted insufficient facts to meet the pleading threshold with regard to the risk of serious bodily injury. On the contrary, we believe that the appellants have alleged facts adequate to satisfy both elements of the analysis, the nature of the damage and the probability of damage prongs, for determining when an exception will lie to the general economic loss bar to recovery.

■ With regard to the first prong, the nature of the damage, the appellants aver that individuals have suffered extremely serious injuries, including paraplegia, quadriplegia and/or death as a result of rear impact collisions in the class vehicles containing the allegedly defective seatbacks. Certainly, as in *Gypsum,* such injuries rise to the level of "serious injury" within the meaning enunciated in *Whiting–Turner* and *Morris.* Under this Court's instruction in *Morris,* that a plaintiff need only allege facts that satisfy one of the prongs of

the analysis to an acceptable degree, the fact that the severity of the potential injury is so grave, in this case, is sufficient to meet the threshold for the petitioners' recovery of economic losses, even if the probability that the injuries would occur is not as high.

 This Court, however, also concludes that the petitioners have alleged sufficient facts to satisfy the second prong of the *Morris* economic loss analysis, as well, the probability that a serious injury, or death, would occur as a result of the allegedly defective seatbacks. In its TAC, the petitioners alleged that thousands of individuals have been injured or killed as a result of the collapse of the class vehicle seatbacks in rear-end collisions. Indeed, the petitioners' exhibit D includes specific records of complaints made to the National Highway Traffic Safety Administration (NHTSA), in which the drivers of class cars experienced the collapse of seatbacks in rear-end collisions resulting in no less than 38 reported injuries and 3 fatalities. The number of these incidents, as alleged, is certainly greater than those alleged in *Morris*, where the appellants alleged no actual record of past injury, a fact to which this Court accorded great weight when holding that the appellants, in that case, did not meet the threshold for economic loss under the *Whiting–Turner* exception. Although we acknowledge the important goal of the general bar to recovery for purely economic losses, to "keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages," *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 870–71, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865, 876–77 (1986), it is exactly the risk of serious bodily injury involved in this case that the exception to the economic loss rule was intended to remedy, to "encourag[e] people to correct dangerous conditions before tragedy results." *Morris*, 340 Md. at 534–35, 667 A.2d 624, 632.

### i. Negligence

 A complaint alleging negligence must contain the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant

breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On Target,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane,* 338 Md. 34, 43, 656 A.2d 307, 311 (1995), *citing Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 188 (1994).

The Court of Special Appeals affirmed the dismissal of the negligence claim solely on the basis that, quoting *Morris, supra,* 340 Md. at 536, 667 A.2d at 633, the petitioners failed to articulate an injury in the form of economic losses sufficient to " 'meet the required legal threshold of pleading the existence of a clear and extreme danger of death or *serious* personal injury, as required by *Whiting–Turner* and its progeny.' " We reiterate that the standard for whether an allegation states a claim upon which relief can be granted does not require the petitioner to assert facts sufficient to *prove* the claim, but rather those necessary to *allege* a claim. As we have seen, the petitioners have met that burden, and thus, viewing all facts and inferences in a light most favorable to the petitioners, we reverse the dismissal of the negligence count.[6]

## ii. Strict Liability

The theory of strict liability is set out in the RESTATEMENT (SECOND) OF TORTS § 402A (1965):

"Special Liability of Seller or Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

---

6. The respondents also contend that "[b]y excluding from the putative class 'all persons who have suffered personal injury as a result of the rearward collapse of a Seat,' " (internal citation omitted), "and by failing to allege any injury to any property belonging to Plaintiffs, the TAC concedes that Plaintiffs suffered no 'actual injury or loss' under the common law of torts." (Respondents' brief, at 10). We do not agree.

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with either."

See *Phipps v. General Motors Corp.*, 278 Md. 337, 341, 363 A.2d 955, 957 (1976). Strict liability "advances the policy of requiring those who make and sell defective products to bear the costs of the injuries that result therefrom." Id. at 342–43, 363 A.2d at 958. *See also Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1963) (holding that the cost of injuries caused by defective products should be "borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."). Official Comment c to § 402A states that a

"seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect . . . [and] public policy demands that the burden of accidental injuries caused by products intended for consumption to be placed upon those who market them and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum protection at the hands of someone, and the proper persons to afford it are those who market the products."

Official Comment i to § 402 A also instructs that a product placed on the market reaches the threshold of being unreasonably dangerous to trigger strict liability when "[t]he article sold [is] dangerous to an extent beyond that which would be

contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

To recover for injury under strict liability, a plaintiff must establish that: (1) the product was in a defective condition at the time that it left the possession or control of the seller; (2) that it was unreasonably dangerous to the user or consumer; (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition. *Phipps,* 278 Md. at 344, 363 A.2d at 958.

In its analysis and holding, the Court of Special Appeals made no specific mention of the petitioner's strict liability claim, but rather relied upon the same reasoning it used to resolve the negligence claim; namely that the petitioners failed adequately to "[plead] the existence of a clear and extreme danger of serious personal injury, as required by *Whiting–Turner* and its progeny." Neither the Circuit Court nor the intermediate appellate court found any other element of a strict liability claim lacking in the petitioner's TAC.

As we have discussed, pursuant to *Whiting–Turner* and its progeny, a plaintiff may overcome the ordinary rule that bars recovery for economic loss in tort claims so long as he or she asserts that there is a strong likelihood that the threatened damage is of a serious nature and that it is reasonably probable that the damage will occur. In other words, when the risk of serious injury or death and the likelihood of the damage are great enough to reach the threshold enumerated in *Whiting–Turner* and *Morris,* the cost to remedy the product defect stands in the place of actual physical injury. We have already determined that the risk of serious injury is so great, and the potential injury in this case so severe that it reaches the threshold enumerated in *Whiting–Turner.*

The respondent in this case has not presented a persuasive argument as to why a petitioner should be barred from recovery of economic losses under a strict liability theory

when the product at issue creates a significant risk of death or serious injury. To be sure, the caveat enunciated in *Whiting–Turner,* that a consumer should not have to wait until injury or death has occurred to assert a claim when the likelihood of injury or death is great, is equally applicable in the case of a strict liability claim, where a party has marketed an item that is unreasonably dangerous.

The Official Comment to § 402 A notes, and we stated in *Phipps* and the Supreme Court of California stated in *Greenman,* that it is the manufacturer that is in the best position to absorb the cost of injuries that result from a product defect. Under the reasoning of *Whiting–Turner* and *Morris,* it is also the manufacturer who should absorb the cost when a product defect creates a serious risk of severe bodily injury or death, even though actual injury has not yet occurred. The alternative would be to require plaintiffs aware of the risk to run the risk and perhaps suffer serious bodily injury, debilitation, or even death, thus incurring damages far in excess, in both human and economic terms, of the costs of remedying the defect. This is needless risk, and even counterintuitive, considering the frequency of serious injuries and death that have been alleged to occur when the class of cars in the case *sub judice* are involved in rear collisions.

### iii. Negligent Failure to Disclose, Failure to Warn, Concealment and Misrepresentation [7]

The petitioners aver that, in addition to the respondents' negligent conduct in manufacturing automobiles with defective seatbacks, the respondents also negligently misrepresented the existence of the defect in the class automobile seatbacks to the general public.

The following elements are required to assert a claim for negligent misrepresentation:

---

7. For purposes of this opinion, we shall refer to this claim as Negligent Misrepresentation.

"(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

"(2) the defendant intends that his statement will be acted upon by the plaintiff;

"(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

"(4) the plaintiff, justifiably, takes action in reliance on the statement; and

"(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Virginia Dare Stores v. Schuman,* 175 Md. 287, 291–92, 1 A.2d 897, 899 (1938); *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 336–37, 439 A.2d 534, 539 (1982); *Gross v. Sussex, Inc.,* 332 Md. 247, 256, 630 A.2d 1156, 1161 (1993). See *generally* RESTATEMENT (SECOND) OF TORTS § 522 (1977).[8]

The Court of Special Appeals affirmed the dismissal of the negligent misrepresentation count on the same grounds that it dismissed the negligence and strict liability counts,[9] because

---

8. Restatement (Second) of Torts § 522 reads:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

9. The Court of Special Appeals never specifically addressed the negligent misrepresentation claim as a separate and independent count.

there had been no actual injury and no allegation of such injury.

■■■■ Our cases make it clear that a plaintiff is not required to suffer personal physical injury to recover under a theory of negligent misrepresentation. *Martens, supra,* 292 Md. at 335–36, 439 A.2d at 538–39 (1982) (holding that "pecuniary loss is compensable under an action for negligent misrepresentation," *citing Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963)). To that end, the Court in *Village of Cross Keys v. Gypsum,* 315 Md. at 754, 556 A.2d at 1132 stated:

> "Although *Whiting–Turner* concerned negligent conduct, similar principles apply when negligent misrepresentation is involved. *See Restatement (Second) of Torts* § 311 comment a (1965), noting that the rule pertaining to negligent misrepresentation involving the risk of physical harm represents a somewhat broader liability than the rule relating to liability for pecuniary loss resulting from negligent misrepresentation."

Under this reasoning, therefore, economic losses qualify as a cognizable injury under negligent misrepresentation.[10]

---

The Court did, however, address the availability of injury, in the form of economic loss under tort, when it stated, in its analysis, "Appellants contend that the circuit court erred in granting appellees motions to dismiss because appellees were liable in tort for the cost of correcting the condition in Class Vehicles. We disagree." Apparently, the court deemed its determination that the *Whiting–Turner* exception to the general bar to recovery for economic losses under a tort theory to apply to all of the petitioner's claims sounding in tort.

**10.** Although the tort of negligent misrepresentation is generally rooted in negligence, in that, like negligence, it requires a duty, breach of duty, injury and causation, the major difference is that negligent misrepresentation focuses on affirmative statements made by the defendant that were intended to, and indeed, had the effect of, inducing the plaintiff to carry out some action in reliance on the false statements. As the Court in *Village of Cross Keys* stated, "[t]o say ... that a claim arises out of 'negligence,' rather than 'misrepresentation,' when the loss suffered by the injured party is caused by the breach of a ... duty to use due care in obtaining and communicating information upon which the party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional ... tort of 'negligent misrepresentation,'...." 315 Md. at 755, 556 A.2d at 1132, *quoting United States v.*

iv. Fraudulent Concealment and
Intentional Failure to Warn

The essential elements for a claim of fraudulent concealment include:

"(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Green v. H & R Block,* 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999). Fraudulent Concealment "is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed." [11]

---

*Neustadt,* 366 U.S. 696, 706, 81 S.Ct. 1294, 1300, 6 L.Ed.2d 614, 621 (1961). A claim of negligent misrepresentation, does not merge into a negligence claim because, if "the plaintiff would have a cause of action based on the underlying negligence independent of the misrepresentation, that cause of action survives and is not merged into the later misrepresentation." *Village of Cross Keys, Inc. v. Gypsum,* 315 Md. at 755, 556 A.2d at 1132, *citing Block v. Neal,* 460 U.S. 289, 296–98, 103 S.Ct. 1089, 1093–1094, 75 L.Ed.2d 67, 74–75 (1983).

11. The petitioners in this case also pled that the respondents engaged in a failure to disclose. As this court stated in *Fegeas v. Sherrill,* 218 Md. at 476, 147 A.2d at 225:

"Concealment and non-disclosure are closely related and in any given situation overlap.... Concealment is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise he would have observed. When done without intent to mislead and without misrepresentation, it has no effect except where there is a duty to disclose.
"Non-disclosure is a failure to reveal facts. It may exist where there is neither representation nor concealment. Except in a few special types of transactions such as insurance contracts and transactions between a fiduciary and his beneficiary, there is no general duty upon a party to a transaction to disclose facts to the other party."

*Id.* (Citations omitted). For all intents and purposes, therefore, fraudulent concealment includes the situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from the defect. A claim of failure to disclose, on

A fraudulent concealment claim is caused, in part, by the intentional failure to warn. As this Court explained in *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, n. 14, 756 A.2d 963, 976, n. 14, *citing Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323–24, 389 A.2d 887, 904 (1978):

> "Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, see, *Walsh v. Edwards*, 233 Md. 552, 557, 197 A.2d 424, 426–27 (1964); *Fegeas v. Sherrill*, 218 Md. 472, 476, 147 A.2d 223, 225–26 (1958), and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known. *Impala, supra*, 283 Md. at 323–24, 389 A.2d at 904."

With regard to the fraudulent concealment claim, the Court of Special Appeals specifically stated that, because "no injury has occurred, appellants are unable to assert that they have suffered damages as a result of any concealment of the alleged defect." The court further held that, "[e]ven assuming *arguendo* that a 'pre-injury' lawsuit is recognized in Maryland, [the trial court] correctly dismissed appellant's tort-based claims ... by concluding that 'the economic loss doctrine would not support the cause of action being sought by the plaintiff in this case.' " *Id.* (slip op. at 16–17).

This court is aware of no reason, nor has one been presented to it, that, so long as sufficient allegations of a serious risk of bodily harm or death has been made, under the *Whiting–Turner* analysis, why the petitioners should be barred from

the other hand, requires only that the defendant remain silent about, or omit, facts that the defendant had a duty to disclose.

asserting a claim for economic loss resulting from fraudulent concealment.

The Court of Special Appeals' decision to affirm summary judgment regarding the fraudulent concealment claims, therefore, is reversed.

### v. Unfair or Deceptive Trade Practices under Maryland Consumer Protection Act

 The Court of Special Appeals determined, and the respondents argue in this Court, that the petitioners have failed to articulate any actual injury or loss to sustain a Consumer Protection Act claim.[12] As we will elucidate, actual physical injury to a person or property or actual product malfunction is not required to state a cognizable injury under the Consumer Protection Act and, thus, the dismissal of the petitioners' Consumer Protection Act claim must also be reversed.

 The Consumer Protection Act, codified at Maryland Code (1975, 2005 Replacement Volume) §§ 13–101 *et seq.* of the Commercial Law Article was "intended to provide minimum standards for the protection of consumers in the State." § 13–101. As this Court explained in *Morris v. Osmose Wood Preserving, supra:*

"The General Assembly enacted the Consumer Protection Act ... in response to 'mounting concern over the increase of deceptive trade practices in connection with sales of merchandise, real property, and services and the extension of credit.' ... The Legislature was concerned that these deceptive practices were undermining public confidence in merchants.... It found existing federal and State laws to be 'inadequate, poorly coordinated and not widely known or adequately enforced,' and found 'that improved enforcement

---

**12.** The Court of Special Appeals dismissed the petitioners' Consumer Protection claim together along with the warranty, fraudulent concealment, and civil conspiracy claims in reliance on the Circuit Court's determination that the "complaint 'does not include any allegation of injury, actual harm, or product malfunction.' "

procedures [were] necessary to help alleviate the growing problem of deceptive consumer practices.' ... With the Act, therefore, the General Assembly intended 'to set certain minimum statewide standards for the protection of consumers across the State' and to 'take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland.' "

340 Md. at 536–37, 667 A.2d at 633 (citations omitted). The Act inter alia, prohibits unfair and deceptive trade practices "in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, consumer services ..." § 13–303(1). Deceptive trade practices include, as relevant:

"(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; [13]

Representation that:

"(i) Consumer goods ... have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \* \* \* \*

"(iv) Consumer goods, consumer realty, or consumer services are a particular standard, quality, grade, style or model which the are not;

---

**13.** In order to satisfy this element, the seller of consumer goods or services must have, either affirmatively or by omission, misrepresented a material fact about the goods. Maryland Code, (1975, 2005 Replacement Volume) § 13–301(3) of the Commercial Law Article; see also *Green v. H & R Block*, 355 Md. 488, 523, 735 A.2d 1039, 1058 (1999) holding that failure of tax preparation service to inform clients that portions of "finance fees" retained by the service amounted to sufficient omission to allow the petitioner to proceed on his Consumer Protection claim; *State v. Cottman Transmissions Sys.*, 86 Md.App. 714, 736 587 A.2d 1190, 1201 (1991), cert. *denied* 324 Md. 121, 596 A.2d 627 (1991)

"(3) Failure to state a material fact if the failure deceives or tends to deceive;

*　　*　　*　　*　　*　　*

"(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer rely on the same in connection with:

(i) the promotion or sale of any consumer goods . . ."

§ 13–301.

A party alleging unfair or deceptive trade practices may file a complaint with the Attorney General's office, § 13–401,[14] or bring a private cause of action. § 13–408.[15] While "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title," § 13–408, a party who files a complaint with the Attorney General, who then brings the action, is not required to allege that actual injury has occurred. § 13–302.[16]

---

**14.** § 13–401 of the Commercial Law Article reads, as relevant,

"(a) A consumer who is subjected to a violation of this title may file with the Division a written complaint which states:
"(1) The name and address of the person alleged to have committed the violation complained of;
"(2) The particulars of the violation; and
"(3) Any other information required by the Division.
"(b) After the filing of a complaint, the Division shall investigate the allegations to ascertain issues and facts. If appropriate, the Division shall refer a complaint to the Federal Trade Commission.

**15.** Maryland Code, (1975, 2005 Replacement Vol.) § 13–408 reads, in pertinent part:

"(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.
"(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."

**16.** Maryland Code, (1975, 2005 Replacement Vol.) § 13–302 of the Commercial Law Article reads:

This Court has held, however, that a private party suing under the Consumer Protection Act must establish "actual injury or loss." *Citaramanis v. Hallowell,* 328 Md. 142, 153–54, 613 A.2d 964, 969 (1992); *Morris v. Osmose,* 340 Md. 519, 538 n. 10, 667 A.2d 624, 635 n. 10 (1995); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999). See Maryland Code, (1975, 2005 Replacement Vol.) § 13–408 of the Commercial Law Article ("any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title"). We have, in earlier cases, established that, in order to articulate a cognizable injury under the Consumer Protection Act, the injury must be objectively identifiable. In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation. *Golt v. Phillips,* 308 Md. 1, 11–14, 517 A.2d 328, 333–335 (1986); *Citaramanis,* 328 Md. at 151–53, 613 A.2d at 968–70 (1992); *Morris v. Osmose,* 340 Md. at 538 n. 10, 667 A.2d at 635 n. 10 (1995); *McGraw v. Loyola Ford,* 124 Md.App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied* 353 Md. 473, 727 A.2d 382, (1999).

In *Golt,* the petitioner entered into a rental agreement to lease the respondent landlord's apartment. 308 Md. 1, 5, 517 A.2d 328, 330. The petitioner agreed to move into the premises only upon the landlord's promise that, prior to the move in date, certain cleaning and repairs would be done. When the petitioner took possession of the property, however, the respondent had not completed the requested repairs. The petitioner paid rent and occupied the apartment for three months, during which time the respondent made no attempt to remedy the condition of the apartment. The petitioner, therefore, contacted the Baltimore City Department of Housing and

---

"Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice."

Community Development, which conducted an inspection of the dwelling. *Id.*

Upon inspection, the Department of Housing discovered numerous housing code violations, which included, *inter alia,* lack of toilet facilities, defective door locks, and the lack of fire exits and fire door. *Id.* at 6, 517 A.2d at 330. Additionally, the housing inspector learned that the respondents did not possess the appropriate license to lease the building as a multiple-family dwelling unit. The respondent was ordered to make the requisite repairs and obtain the proper license. *Id.* Rather than obtain a license and make the repairs, the respondent chose to evict the petitioner, forcing the petitioner to move to a new, more expensive apartment. Furthermore, the respondent refused to refund all of the petitioner's security deposit, withholding a portion of it for one month's rent and for utility charges.

The petitioner filed suit in District Court for violation of the Consumer Protection Act and seeking recovery of, *inter alia,* his security deposit. *Id.* The District Court found that the petitioner was entitled to the return of the total amount of his November rent because "the dwelling was unlicensed, and, therefore illegal to rent," *id.* at 6, 517 A.2d at 330, and that the respondent had improperly withheld the security deposit. The District Court held, however, denied the petitioner relief under the Consumer Protection Act, holding that he had viewed the premises prior to moving in and, thus, was fully aware of their condition. Id. The Circuit Court for Baltimore City dismissed the petitioner's appeal and this court granted certiorari. *Id.* at 7, 517 A.2d at 331.

We reversed, holding that the failure of the respondents to disclose the material fact that it did not hold a license to rent the premises as a multi-family unit amounted to a violation of the Consumer Protection Act. *Id.* at 9, 517 A.2d at 332. Particularly, we stated:

"Implicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful. Baltimore City Code, Art. 13, § 1101 (1983 Repl.

Vol.) expressly prohibits the operation of any multiple family dwelling without a license or temporary certificate. As [the respondent] had neither a license nor a temporary certificate, it violated the City Code. Consequently, [the respondent's] advertisement and rental of the apartment was a 'misleading ... statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.' Maryland Code (1983 Repl.Vol.), § 13–301($l$) of the Commercial Law Article."

*Id.* Recognizing that the purpose of a licensing scheme served the important purpose of ensuring that landlords do not rent apartments that are "hazardous to the safety or welfare of the people," *id.* at 13, 517 A.2d at 334, we noted that licensing "is an integral part of the City's effort to maintain safe residential conditions for its citizens." To that end, we explained:

"Dwellings that are not licensed provide no opportunity for the City to ensure minimum living conditions. Furthermore, an annual license fee for a multiple dwelling unit is only $20.00 per dwelling unit ... It is evident that the license fee is charged to support the cost of inspections, and not to raise revenue. Therefore, [the respondents] may not retain any benefits from the unlicenced lease and [the Petitioner] may recover his full damages."

*Id.* at 13–14, 517 A.2d at 334.

With regard to the petitioner's loss, this Court determined that he was entitled to restitution of the total amount he paid in rent, as well as consequential damages, including the cost of moving to a new apartment and the "difference in cost between reasonable substitute housing and the rental charged for the remainder of the legal term of his lease with the [respondents]." *Id.* at 13–14, 517 A.2d at 334.

In *Citaramanis,* this Court further clarified when an injury is deemed sufficiently pled to state a consumer protection claim. In that case, the petitioner rented a house from the respondent homeowners for a period of one year. During that time, the petitioners did not complain regarding the condition of the home and, despite the fact that the respondent in-

creased the rent, extended their tenancy beyond the first year, *Citaramanis*, 328 Md. at 144–45, 613 A.2d at 965. During the tenancy, only minor repairs were made on the home. After the petitioners informed the respondents that they planned to move, they learned that the respondents, when they rented the house, did not have a license to do so. *Id.* Armed with that information, the petitioners filed, in the Circuit Court for Howard County, a complaint alleging that the respondents had engaged in unfair and deceptive trade practices prohibited by the Maryland Consumer Protection Act and praying the return of all of the rent they paid to the respondent during their tenancy. *Id.*

The respondents did not dispute that they failed to obtain a license before renting their home to the petitioners, nor did they dispute that they failed to obtain the license at any time during the petitioners' tenancy. Upon cross-motions for summary judgment, the Circuit Court granted the petitioners' motion, relying primarily on this Court's reasoning in *Golt*, and awarded the petitioners the full amount of the rent they paid to the respondents during their tenancy. *Id.* at 146, 613 A.2d at 966.

The Court of Special Appeals reversed, holding that "because the [petitioners] had not demonstrated that any condition of the premises during their tenancy constituted a 'substantial housing code violation' . . . or the lack of licensure had caused a diminution in value of the property" they had not incurred actual damages, a prerequisite to recovery in a private action under the Consumer Protection Act. *Id.* at 147, 613 A.2d at 966 quoting *Hallowell v. Citaramanis*, 88 Md.App. 160, 594 A.2d 591 (1991).

Before this Court, the petitioners argued that the condition of the house in that case was irrelevant. They relied on the following language in *Golt:*

"It is evident that the [multiple family dwelling] licensing fee is charged to support the cost of inspections, and not to raise revenue. Therefore, Phillips Brothers may not retain

any benefits from the unlicenced lease, and Golt may recover his full damages."

*Id.* at 150, 613 A.2d at 967.

Recognizing that, with regard to the *Golt* decision, "[b]ecause of the obvious actual loss and damage suffered by the tenant [in that case], who paid rent for what proved to be an uninhabitable apartment, we realize now ... that we spoke much too broadly in making the statement just quoted," *id.* at 150, 613 A.2d at 967, we distinguished the situation in *Golt* from the one at bar. We noted that, in *Golt,* as a result of the landlord's failure to obtain a license and abide by the requirements of the Baltimore City Code, the tenant was forced to live in conditions violative of basic health and safety, including "no toilet in [the tenant's] apartment, no fire doors, defective door locks, and no fire exits." 328 Md. at 148, 613 A.2d at 966. Furthermore, this Court clarified, the tenant in *Golt* was evicted when the landlord decided not to obtain a license as required by the City, which required the tenant to incur moving expenses and an increase in rent when he had to lease a new apartment. *Id.* at 147–48, 613 A.2d at 966.

By contrast, the CitaraManises alleged neither uninhabitable conditions nor monetary loss as a result of their landlord's failure to obtain a license. This Court explained:

"the CitaraManises do not allege that the house they rented was unclean, unsafe, unhabitable or unsuitable in any regard. To the contrary, during argument before the trial judge, the [petitioner]'s counsel explicitly argued that the condition of the property was irrelevant because the basis of their cause of action is misrepresentation regarding the failure to license, not the condition of the property. Indeed, the [petitioners] elected to extend their tenancy and remain on the premises for another six months after the termination of the original lease at a higher rent."

*Id.* at 149, 613 A.2d at 967.

We further elucidated that, under the Consumer Protection Act a party may pursue a public remedy, by filing a claim with the Attorney General, a private remedy, by filing a private

cause of action, or both. We noted, however, that there is a difference between the two options with regard to the necessity of pleading injury or harm:

> "Notwithstanding the availability of both public and private remedies to consumers, the Legislature has established a clear distinction between the elements necessary to maintain a public enforcement proceeding versus a private enforcement proceeding, In a public enforcement proceeding any practice prohibited by this title is a violation ... whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." § 13–302. In contrast, a private enforcement proceeding pursuant to § 13–408(a) expressly only permits a consumer "to recover for injury or loss sustained by him as the result of a practice prohibited by this title." § 13–408(a). Section 13–408(a), therefore, requires and aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice. This statutory construction creates a bright line distinction between the public enforcement remedies available under the CPA and the private remedy available under § 13–408(a).

*Id.* at 151, 613 A.2d at 968. The requirement that parties plead actual injury or harm in a private cause of action under the Consumer Protection Act:

> "is said to prevent aggressive consumers who were not personally harmed by the prohibited conduct, or even involved in a transaction with the offending businessman, from instituting suit 'as self-constituted private attorneys general' over relatively minor statutory violations. Another fear is that the powerful weapon given to consumers in the form of the private remedy 'was capable of being used improperly for harassment and improper coercive tactics.'"

*Id.* (*quoting* 1 H. ALPERIN & R. CHASE, CONSUMER LAW: SALES PRACTICES AND CREDIT REGULATION § 136 at 193).

We acknowledged the differing interests sought to be promoted by the public and private enforcement proceedings.

"[T]he CPA's public enforcement mechanisms are set up to prevent potentially unfair or deceptive trade practices from occurring, even before any consumer is injured, whereas § 13–408(a) requires that actual 'injury or loss' be sustained by a consumer before recovery of damages is permitted in a private cause of action. A construction of the CPA that would establish § 13–302 as a benchmark to determine whether a consumer has sustained 'injury or loss' within the meaning of § 13–408(a) is both strained and illogical."

*Id.* at 153, 613 A.2d at 969 *quoting* Comment, *Maryland's Consumer Protection Act: A Private Cause of Action for Unfair or Deceptive Trade Practices*, 38 Md. Law Rev. 733, 739 n. 50 (1979).

With those rules in mind, the Court held that, unlike the petitioner in *Golt*, the *Citaramanis* petitioners neither claimed that they received less than the full benefit of their agreement nor incurred any costs as a result of the respondents' failure to obtain a license; they alleged no injury or loss under the Consumer Protection Act.

In the case *sub judice*, it is clear that the petitioners have alleged facts constituting a loss. Particularly, the petitioners allege that, as a result of the respondents' misrepresentation or omission, they suffered a loss, measured by the amount it will cost them to repair the defective seatbacks.[17]

---

17. The reasoning of the United States District Court for the Southern District of Indiana, in *In re Bridgestone/Firestone, Inc.*, 155 F.Supp.2d 1069 (2001) *rev'd on other grounds*, 288 F.3d 1012 (7th Cir.2002), is instructive. There, the plaintiffs sued the defendant tire manufacturers for violation of the Tennessee Consumer Protection Act and the Michigan Consumer Protection Act. They sought recovery of the diminution in value of the class automobiles as a result of allegedly defective tire treads. *Id.* at 1076–77. The applicable consumer protection acts provided that a plaintiff could recover for injuries so long as the plaintiff "suffere[d] *ascertainable* loss of money or property as a result . . . of an unfair or deceptive act or practice . . ." *id.*, 155 F.Supp.2d 1069, 1097 or "suffere[d] loss as the result of a violation of th[e] act", *id.*, respectively. The court denied the defendants' motion to dismiss the consumer protection claims for failure to state an injury, reasoning that loss under, both States' version of the Consumer Protection Act included the " '[failure to] receive what [a plaintiff] expected to re-

In *Golt*, the amount of the loss was quantified, in part, by the amount the petitioner had to pay to remedy his situation; namely, the difference between the amount he had to pay to rent another apartment and the rent he was originally paying in the unlicensed apartment. In *Citaramanis*, the petitioners articulated nothing they had lost as a result of the alleged misrepresentation. We conclude that the alleged damages in this case are more like those in Golt, in that they constitute no more than the amount it would take to remedy the loss they incurred as a result of the respondents' alleged deceptive trade practices. Thus, we hold that they have set forth sufficient facts of injury or loss to withstand dismissal of the consumer protection claim.

### Sufficiency of Pleading the Fraud–Based Claims

The Court of Special Appeals also dismissed the petitioners' fraudulent concealment, intentional failure to warn and Consumer Protection Act claims on the basis that the petitioners failed to allege sufficiently particularized facts with regard to those counts. It concluded:

> "Fraud-based claims, such as unfair trade or deceptive trade practices pursuant to the Maryland Consumer Protection Act, must identify actionable misrepresentations. As to each of their fraud-based claims, appellants make vague assertions about generalized statements attributed to no particular appellee and/or allegedly do not constitute action-

ceive.' " *Id.* at 1098 *quoting Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178, 341 N.W.2d 268, 271–72 (1983). Noting that the loss "can arise from the 'frustration of [the plaintiff's] expectations,' as created by the defendant", *id.*, the court continued: "[I]t is of no consequence that most Plaintiffs have not alleged that they tried to sell, trade in, or replace their Tires or Explorers.... Plaintiffs need not allege that they ever tried to sell or trade in their tires or vehicles or that they experienced tread separation in order to state a loss." *Id.* Similarly, in the case *sub judice*, in order to allege a loss under the consumer protection act, the petitioners need only articulate some manifestation of loss. The fact that they have not yet repaired the defective seatbacks is of no import so long as the petitioners have alleged a difference between what was expected and what was received as a result of the respondents' misrepresentation.

able misrepresentations. Such statements do not constitute actionable misrepresentations. The allegations made in appellants' complaint are simply not sufficiently particularized to satisfy Maryland's standard for pleading a fraud action." [18]

■ In their brief in this Court, the respondents argue, that "THE INSUFFICIENCY OF THE PLAINTIFF'S FRAUD–BASED CLAIMS IS NOT PROPERLY BEFORE THE COURT." Relying on Maryland Rule 8–303(b)(1), which states that "[t]he petition shall present accurately, briefly, and clearly whatever is essential to a ready and adequate understanding of the points requiring consideration," the respondents assert that, because the petitioners failed to include, in their Petition for Writ of Certiorari to this Court, an argument addressing the intermediate appellate court's determination that the fraud-based claims were insufficiently particularized, they have effectively waived that argument. The Court of Special Appeals' decision with regard to that argument, therefore, they argue, should be left undisturbed. This Court disagrees.

Although the petitioners did not assert, in their Petition for Writ of Certiorari, a *question* challenging the propriety of the Court of Special Appeals' dismissal of their consumer protection claim for lack of particularity, the petitioners do, in subsection "E" of the argument portion of the petition, aver that "The Allegations in the TAC are Sufficiently Specific." The petitioners argue at length that they sufficiently pled, with adequate detail, the injury component of the fraud-based claims.[19]

---

**18.** In its discussion of the petitioners' failure to sufficiently allege particular facts to plead its fraud based claims, the court only specifically mentions the petitioners' failure to plead the Consumer Protection Act claim and the conspiracy claims. The court presumably omitted the fraudulent concealment and intentional failure to warn counts from its discussion, because it had already determined that economic loss was not a recognizable injury in tort.

**19.** We note that the petitioners appear to have been responding to the Court of Special Appeals' determination that they had insufficiently

On page 15 of the Petition, the petitioners assert that they pled sufficient facts to allege all of the elements of the fraud-based claims. Particularly, the petitioners argue that, in their TAC, they alleged "[f]acts further describing the Defect, its origin, its severity, and the exposure to harm to Appellants and Class Members [which were] grouped into sections entitled 'Risk of severe injury or death (paragraphs 27–32), 'Automobile seat as a safety device (paragraphs 33–39), 'Weakness of the Seats' (paragraphs 40–42), 'Thirty-year industry awareness of Defect' (paragraphs 43–54), 'The 30–year cover-up' (paragraphs 55–70), 'Platforms' (paragraphs 71–72), 'Coordination of Efforts' (paragraphs 73–77), 'Safe alternative designs' (paragraphs 78–80), 'Marketing; Concealment of known De-

---

pled injury to recover on the substantive claims in their TAC. In fact, throughout the majority of the opinion, the Court addressed each of the petitioners' substantive counts *only* to the extent that they failed to articulate an appropriate injury. This is in line with what the Circuit Court judge determined when, in the brief decision he delivered from the bench, it stated:

> "There is no dispute that the plaintiffs are bringing a cause of action in which part of their cause of action does not include any allegation of injury, actual harm, or product malfunction.
>
> "It is alleging a defect and it is alleging a defect without nay injury or loss to the plaintiffs. Now, the plaintiffs have argued strenuously, and have ever effectively presented reasons that they should be allowed to pursue this cause of action, and at the risk of being accused of suffering from myopia, the law in Maryland is not yet such that this cause of action should be permitted to continue.
>
> "*Whiting–Turner* does not apply to this case. . . ."
>
> "It is clear to me that this is a case that is not recognized as a cause of action in Maryland. In addition, the economic loss doctrine would not support the cause of action being sought by the plaintiffs in this case, and there is insufficient basis to allow a fraud claim to continue against these defendants."

With regard to the fraudulent concealment, warranty, Consumer Protection Act, and civil conspiracy claims, the intermediate appellate court stated, generally, at the beginning of its analysis, "Appellants contend that Judge Rupp erroneously dismissed [these counts]. . . . We disagree. Judge Rupp dismissed these claims because the complaint does not include any allegation of injury, actual harm, or product malfunction." In fact, it is only in the discussion of the petitioners' last count, civil conspiracy, that the court makes any mention that the petitioners failed to plead, *generally,* the fraud-based counts.

fect' (paragraphs 81–85), and 'Lack of consumer awareness of Defect' (paragraphs 86–91)."

Although, it is true that the gist of the petitioners' argument in its Supplemental Petition regarding the dismissal of the fraudulent concealment and consumer protection claims, focused, primarily, on the sufficiency of their allegations of injury, we note that, as a matter of course, the petitioners also included, by recapitulation of those facts supporting each element of the fraud claims, an argument that all of the facts, as pled, were sufficient to state their fraud claims. We conclude that this is sufficient to preserve the arguments on appeal.

■ We also believe that the petitioners amply pled that the respondents made actionable misrepresentations or omissions to support their fraud allegations. For example, with regard to the their fraudulent concealment and intentional failure to warn claims,[20] the petitioners allege, in paragraph number 43 of the TAC that "[respondents] GM, Ford and Chrysler have known the risk of injury associated with the [defective seatbacks] for over 30 years. Saturn has known of the risk since Saturn came into existence." Paragraphs 44 through 54 provide facts that support that assertion. Paragraphs 55 through 72 support the petitioners' allegation that, despite their knowledge of the defective seatbacks, the respondents have engaged in a 30–year cover-up of the product malfunction.[21] Paragraphs 81 through 85 allege that the

---

**20.** Although it may be true that the facts, as alleged under the Claim headings at the end of the petitioners' TAC, constitute vague allegations of wrongdoing, the petitioners prefaced each count with the following: "The allegations in the preceding paragraphs are hereby incorporated by reference." Those preceding paragraphs constitute the "flesh" of the Complaint and are replete with facts that support the fraud claims.

**21.** For example, paragraph number 55 read:
"GM has approached seat safety in two ways: Outwardly, GM denied there was any problem with the strength of its seat backrests and promoted a standard that it knew was unreasonably unsafe. Internally, GM conducted research that showed that strong seats were a major factor in the survivability of occupants in rear-impact collisions, and

petitioners have concealed the existence of the seatback defect. To that end, the petitioners assert the following:

"81. Despite Defendant's knowledge that the seats are unreasonably unsafe and that preventable injuries and death will result, they have continued to manufacture, market, distribute and sell Class Vehicles equipped with the seats.

"82. Defendants knowingly and intentionally concealed from the public, including Plaintiffs and the Class Members, the risk of substantial injury or death from Seat Collapses."

These allegations, as written, certainly reach the threshold of pleading misrepresentation or omission to withstand the dismissal of the petitioners' fraudulent concealment and Consumer Protection Act claims.

### vi. Civil Conspiracy Claim

■ A claim for civil conspiracy requires proof of the following elements:

"1) A confederation of two or more persons by agreement or understanding;

"2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and

"3) Actual legal damage resulting to the plaintiff."

*Van Royen v. Lacey*, 262 Md. 94, 97–98, 277 A.2d 13, 14–15 (1971); *Damazo v. Wahby*, 259 Md. 627, 270 A.2d 814 (1970); *Green v. Washington Suburban Sanitary Comm'n*, 259 Md. 206, 221, 269 A.2d 815, 824 (1970). This Court has consistently held that " 'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. The Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1044–45 (1995), quoting *Alexander &*

---

that its seats were unreasonably unsafe. GM concealed its damaging research from government and the public, and carried on this duplicity for over 30 years. Only through litigation, after lengthy discovery battles in other suits, has the truth been exposed."

*Alexander v. B. Dixon Evander & Associates, Inc.,* 336 Md. 635, 645 n. 8, 650 A.2d 260, 265 n. 8(1994); *Van Royen,* supra.

Similar to its reason for affirming the dismissal of the fraud claim, the intermediate appellate court affirmed the dismissal of the civil conspiracy count on the basis that the petitioners failed to allege sufficient facts adequately to plead the elements of civil conspiracy. To that end, quoting *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 359, 758 A.2d 95, 109 (2000), the court held that the petitioners' civil conspiracy charge amounted to " 'vague, confused, and extremely ambiguous' allegations [that were] insufficient to state a claim for civil conspiracy."

As we have seen, this Court has already determined that the petitioner's tort claims were sufficiently pled. Therefore, the petitioner has alleged a tortious act upon which the conspiracy claim could be based. The question then is, whether the petitioners have pled adequate facts to allege that the respondents worked in concert to carry out the fraudulent concealment.

 In the Civil Conspiracy count, the petitioners state, as a preliminary matter, that "[t]he allegations in the preceding paragraph are hereby incorporated by reference." Paragraphs 73 through 77 then detail the facts upon which the petitioners rely for support of their conspiracy claim:

"73. GM, Ford and Chrysler coordinated their efforts, shared information and planned together to oppose the implementation of any reasonable standard for seat backrest strength. Consistent with this effort, Defendants went three decades without strengthening the seat backrests in most of their vehicles . . .

"74. In 1992 the television program, "60 Minutes" aired a story on auto seat failures. This prompted Ford to start a project code-named, "Straw–Dog," to develop defenses against claims based on seat failures. Straw Dog was coordinated with similar projects by GM and Chrysler.

"75. In 1993, while it was aware that moving barrier tests were more realistic and accurate than static tests for

assessment of seat integrity in rear-impact collisions, Ford recommended static tests to NHTSA. As a result of collusion with GM, and while aware of the falsity of its position, Ford argued to NHTSA that a yielding seat was preferable to a rigid seat for purposes of occupant protection.

"76. Defendants agreed and conspired among themselves to share and coordinate their knowledge, data, research activity, and decisions respecting the design and testing of seatbacks. For example, internal communications in 1992 among members of Ford's internal Seat Back Task Force investigating Ford's yielding front seatbacks refer to the desirability of using the auto industry's Crash Dummy Consortium, which included all Defendants, to ensure such coordination among Defendants. One such communication noted that it "would be worse than silly" for Ford's seat Back Task Force to be "going in one direction" regarding front seatback design and for the auto industry's industry-wide research program on this subject to be going in a 'conflicting direction' with Ford not 'know[ing] it'."

"77. The purpose and intended effect of Defendants' conspiracy and the overt acts in furtherance thereof have been to stabilize, suppress, and lock competition among Defendants in designing, manufacturing, and selling reasonably crashworthy front seatbacks for Defendants' 1990–1999 cars. Such a conspiracy in restraint of trade is per se illegal under federal an state antitrust laws. As a result of this conspiracy and its execution, the Class Vehicles are defectively designed, are unreasonably dangerous and unsafe, and are not reasonably crashworthy, and the owners and consumers of such cars are substantially exposed to serious injury and death in the event of a rear-impact collision."

It is clear to this Court that the facts pled in the TAC were not vague assertions, but rather were pointed facts alleging specific acts of conspiracy on the part of the respondents. Therefore, the Court of Special Appeals' decision to affirm the Circuit Court's grant of summary judgment on this ground is reversed.

## B. Contract Claim

### Implied Warranty of Merchantability

■ It is clear that, under the Maryland Uniform Commercial Code, codified at Maryland Code (1975, 2002 Replacement Vol.) § 2–314 of the Commercial Law Article, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." [22] With regard to automobiles, the implied warranty of merchantability not only warrants that the automobile will operate effectively, but that it will provide reasonably safe transportation. *Frericks v. General Motors Corp.,* 274 Md. 288, 301, 336 A.2d 118, 126 (1975) (holding that "[a] warranty that an automobile is fit for the ordinary purposes for which such goods are used logically includes a promise that a reasonable measure of safety has been provided when inevitably, collisions do occur." [internal quotations omitted] ); see also *Mercedes–Benz of North America, Inc. v. Garten,* 94 Md.App. 547, 562, 618 A.2d 233, 240 (1993).

■ As the Court of Special Appeals stated below in this case:

> "[i]n order to recover for a breach of implied warranty of merchantability, the plaintiff must establish that:
>
> "(1) a warranty existed;
>
> "(2) the product did not conform to the warranty [and thus the warranty was breached]; and
>
> "(3) the breach of warranty by the seller was the cause of the injury to the user or third party."

---

**22.** Maryland Code (1975, 2002 Replacement Volume) § 2–314 of the Commercial Law Article provides in pertinent part:

"(1) Unless excluded or modified (§ 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.... "(2) Goods to be merchantable must be at least as such as ... "(c) Are fit for the ordinary purposes for which such goods are used...."

See also *Mattos v. Hash*, 279 Md. 371, 379, 368 A.2d 993, 997 (1977); *Ford Motor Co. v. General Accident Ins. Co.*, 365 Md. 321, 335, 779 A.2d 362, 370 (2001).

The elements necessary to assert a breach of implied warranty claim are similar to those required for strict liability tort claims. See *Virgil v. Kash N' Karry Service Corp.*, 61 Md.App. 23, 30, 484 A.2d 652, 656 (1984) (holding that "[t]o recover on either theory—implied warranty or strict liability—the plaintiff in a products liability case must satisfy three basics from an evidentiary standpoint: (1) the existence of a defect, (2) the attribution of the defect to the seller, and (3) a causal relation between the defect and the injury."). Each cause of action, however, protects different aspects of a consumer's rights. Strict liability seeks to protect personal and property interests, while implied warranty protection seeks to ensure that consumers receive the benefit of their bargains. See David C. Issacson, *Recovery for Property* Loss under Theories of Negligence and Strict Liability in Tort, 54 Md. Law. Rev. 860, 862 (1995).

The remedy for the breach of an implied warranty, set forth in § 2–714 of the Commercial Law Article, provides:

"(1) Where the buyer has accepted goods and given notification ... he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under ... may also be recovered." [23]

---

**23.** Under the Maryland UCC, §§ 2–313, 2–314 and 2–315, a merchant who sells goods to a consumer potentially makes three warranties: 1) an express warranty, which, as is indicated by its title, becomes part of a bargain only when the seller makes a particular "affirmation of fact

Furthermore, Maryland Code (1975, 2002 Replacement Volume) § 1–106 instructs us that the remedy for breach of warranty causes of action, and, indeed the remedies for all UCC claims "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...." Therefore, in recognition of the primary goal of contract warranties to ensure that consumers receive the benefit of their bargains, the remedy provided by 2–714 allows aggrieved consumers to "recover damages" in any reasonable manner, to the extent that it provides them with the full value of the goods for which they have contracted.

The sole basis for the Court of Special Appeals' reasoning for dismissal, with regard to the Breach of Implied Warranty claim was that "no actual harm or damages ha[d] yet occurred." In reaching its decision, and, without reference to supporting case law, the intermediate appellate court presumably relied upon the literal interpretation of the word "injury" in the third element to require actual bodily harm, damage to property or actual property malfunction before a claim for products liability in economic damages will lie.[24] That interpretation is incorrect.

---

or promise ... that the goods shall conform to the affirmation or promise." § 2–313; 2) an implied warranty of merchantability, the warranty at issue in this case, and which warrants that goods are fit for the general "purposes for which such goods are used." § 2–314; and 3) an implied warranty of fitness for the particular purpose, which warrants that goods will be fit for a particular purpose of a consumer, even when such goods are not usually used for the consumer's intended purpose, so long as the "seller at the time of contracting has reason to know [the consumer's] particular purpose for which the goods are required and ... the buyer [relies] on the seller's skill or judgment to select or furnish suitable goods ..." § 2–315. Section 2–714 is the remedy provision for breach of each of these warranties.

**24.** There is no question in this case, that the respondents, automobile manufacturers, are merchants in the business of selling automobiles to consumers like the petitioners. There is also no question that the respondents impliedly warranted that the automobiles purchased by the petitioners were fit for the ordinary purpose for which they were intended, and thus, by extension, that they were reasonably safe.

■ Although a plaintiff must plead, under a theory of breach of implied warranty, that the seller's breach was the proximate cause of injury, the language does not announce a rigid definition of injury to include only actual bodily injury or product malfunction. To the contrary, when read in context with the language of the remedy provision which dictates that a buyer may recover damages "for any nonconformity of tender[,] the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable," § 2–714(1), the injury requirement embraces a much more inclusive definition of the damages a buyer may recoup when the seller warrants that goods are fit for the ordinary purpose for which goods of its kind are intended, i.e., in this case, that the goods are fit for reasonably safe operation of a motor vehicle.

■ The more appropriate definition of the damages that qualify as a cognizable injury in a breach of warranty claim can be gleaned from § 2–714(2) which provide that the measure of damages for breach is "the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted ..." Thus, the injury arises when the seller fails to tender the goods in a manner that is fit for ordinary purposes, and the damages are the difference between what the buyer would have received if he or she received the full measure of the bargain, which the seller warranted, and what the buyer received in less-than-fit goods. So long as it is reasonable, the buyer may recover that difference to arrive at the full benefit of his bargain—a result that embodies the paramount interest of contract law.

The injury contemplated under § 2–314 and § 2–714, includes the cost to repair the defect. *The Camden Consolidat-*

---

Because, as we have seen, the sole basis for the intermediate appellate court's decision with regard to the breach of warranty claim was that the petitioners failed to articulate any immediate actual injury—it noted that "[b]ecause no injury has occurred, appellants are unable to assert that they have suffered damages as a result of any concealment of the alleged defect,"—we shall assume that the court implicitly found that all other elements of the count were sufficiently pled.

ed Oil Co. v. Schlens, 59 Md. 31, 43 Am.Rep. 537 (1882); *Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.,* 488 F.Supp. 574, (D.Md.1980); *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77 (1977); *Schroeder v. Barth Inc.* 969 F.2d 421 (7th Cir.1992). *See also* WILLIAM D. HAWKLAND, HAWKLAND UNIFORM COMMERCIAL CODE SERIES, UCC § 2–714. BUYER'S DAMAGES FOR BREACH IN REGARD TO ACCEPTED GOODS (interpreting repair and replacement as "provid[ing] evidence to prove the difference between the value of the goods as accepted and the value they would have had if they had met the warranty" and noting that "[i]n situations in which the buyer decides not to repair or replace the defective goods, but to use them in their defective condition, ... damages can be determined based on estimates of what it would cost to repair or replace.").

*Camden,* a case decided long before the adoption of the Uniform Commercial Code, first enunciated the view that an injury, in the form of economic loss, in contract claims, includes the cost to repair or replace a defective product notwithstanding the fact that the buyer has not suffered actual injury. *Camden,* 59 Md. at 43–46. In that case, the respondent, vendee, Schlens Company, contracted with the petitioner, vendor, Camden Consolidated Oil Company, to purchase oil, the quality of which was to be "color standard white, or better," *id.* at 32, and was to burn at a test of "110 degrees [f]ahrenheit or upwards." Id. When the oil reached its destination in Europe, however, the first two of the three shipments of oil tested to less than 110 degrees Fahrenheit and, thus, could not be sold. The third and final shipment could not be sold because "the inferiority of [the] brand in the two previous cargos had given it a bad name." *Id.* at 33. The respondent brought suit in assumpsit alleging that the petitioner oil company failed to meet the requirements of the contract.

The Court held that the respondent vendee was entitled to recoup damages for "injury" that arose when the petitioner-vendor failed to meet the specifications of the con-

tract. *Id.* at 45. Calculating damages, it applied the "general rule ... that the measure of damages is the difference between the contract price and the market price at the time and place of delivery."[25] *Id.* The Court explained:

> "The application of this rule ordinarily secures to the injured party indemnity or compensation for the loss arising from the breach of the contract, which is the true principle upon which damages are estimated in civil suits; and the reason for the rule is that it is ordinarily in the power of the vendee to go into the market and purchase goods of the same quality at the market price."

*Id.* at 44.

The U.S. Court of Appeals for the Fourth Circuit more recently reiterated the rule that consumers are entitled to recoup economic losses resulting from a breach of warranty in *Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.*, 488 F.Supp. 574 (4th Cir.1980). In that case, the petitioner, a motorcycle distributor, sued the respondent, an East German motorcycle importer, on various theories of contract and tort, when the latter failed to deliver 988 contracted-for motorcycles with a "certificates of compliance." These certificates were to verify that the motorcycles were in compliance with federal safety standards as required by a provision of the Traffic and Motor Vehicle Safety Act, then codified at 15 U.S.C. § 1397(a) and (b)(3). *Id.* at 579–80. The respondent failed to provide the certificates even though it had warranted that the motorcycles would be delivered "in compliance with

---

**25.** The general rule is enumerated in *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854): "the damages for a breach of contract should be such as may fairly and reasonably be considered, either as arising naturally, i.e. according to the usual course of things from such breach of the contract itself; or such as may reasonably be supposed to have been in contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." The court also awarded consequential and incidental damages incurred as a result of the breach of contract. Noting that the oil contracted for was to be shipped abroad, the court determined that the petitioners were entitled to receive recompense for all of the "necessary and proper charges" they incurred in storing and replacing the defective oil as well as interest on the total amount. *Camden* at 45.

all federal and state laws, statutes and regulations," *id.* at 579, and despite the petitioner's repeated requests for the delivery of the certificates over a period of three years. Eventually, the petitioner was compelled to seek alternative means for meeting federal compliance by having each of the motorcycles tested and approved by the National Highway Traffic Safety Administration. *Id.*

The petitioner argued, before the United States District Court for Maryland, that the respondents breached express and implied warranties that the motorcycles would be fit for sale in the United States and the District Court agreed, holding that

> "at all times[, it was] clear that Byers purchased the motorcycles from East Europe for the purpose of reselling them to dealers within its area of distribution. Under 15 U.S.C. §§ 1397(a)(3) and 1398(a), however, resale of the motorcycles would have subjected Byers to a civil penalty of up to $1000 for each sale. On these facts, it is evident that the goods were not merchantable as to Byers, and that recovery for breach of implied warranty is proper."

*Id.* at 580.

Other jurisdictions have reached a similar result, and have consistently interpreted economic losses as measurable damages for violations of the implied warranty of merchantability. For example, the Supreme Court of Texas held that a plaintiff, who purchased a mobile home that turned out to have significant defects, suffered economic loss in the form of lost value in the mobile home, and was entitled to the difference between the market value of the mobile home constructed in a manner fit for ordinary use, and the market value of the home with the defects. *Nobility Homes, supra,* 557 S.W.2d at 78. The court recognized that

> "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the

nature of the responsibility a manufacturer must undertake in distributing his products."

*Id.* at 79. The court further recognized that "[t]he fact that a product injures a consumer economically and not physically should not bar the consumer's recovery," *id.* at 81, and "implied warranty remedies apply to economic injuries ...,[which is] consistent with 'the well developed notion that the law of contract should control actions for purely economic losses and that the law of tort should control actions for personal injuries.'"[26] *Id.* at 82 (internal citation omitted).

The United States Court of Appeals for the 7th Circuit relied, in particular, on the cost of repairs as the measure of the underlying injury in *Schroeder v. Barth, Inc., supra,* 969 F.2d 421. In that case, the petitioners, purchasers of a motor home that had "sixty-one separate problems," argued that they should receive not only the amount of direct damages, quantified by the cost to repair the mobile home defects, but the total cost of the motor home plus consequential and incidental damages, court costs and attorneys fees. *Id.* at 422. In support of their warranty claims, one of the petitioners submitted an affidavit, in which he averred that the motor home was "worthless" to him. *Id.* The petitioners also submitted the expert testimony of a health care provider, who estimated that the motor home's market value was diminished by virtue of the multiple defects. *Id.* In response, the respondents argued that the witness was not qualified to give expert testimony regarding the market value of the motor home and filed a motion for summary judgment requesting the court to limit the petitioners' damages to the amount they paid to

---

26. The court also enunciated the general rule that tort claims generally should not be recognized as providing a remedy for economic losses. That general rule was particularly true in that case because there was no allegation that the defective mobile homes were constructed in a way that posed a significant risk of bodily harm. The court apparently contemplated the fact that there might potentially be a viable claim for economic losses under a tort theory if such a risk of harm existed when it noted that "[t]here is no finding in this case that the product was unreasonably dangerous to [the petitioner] ..." *Id.* at 80.

repair the motor home defect, which the district court granted. *Id.* at 422–23.

On appeal, the 7th Circuit Court of Appeals affirmed, finding that the petitioners' nebulous claims that the motor home was "worthless" and the tenuous testimony of their expert witness were insufficient to meet their burden of proving a material issue as to the proper measure of damages. *Id.* at 424. The court agreed that the method for affixing damages in that case was most appropriately the quantifiable amount it cost to repair the vehicle. *Id.* at 425.

■■■ These cases buttress our determination that petitioners are not required to plead that they have suffered a physical bodily injury in order to prove a breach of warranty. Nor must a plaintiff prove that the product actually malfunctioned. To the contrary, a plaintiff need only plead that the automobiles were sold with a defect and that the defect rendered the goods unfit for ordinary and safe use. In other words, the injury arises, *ipso facto*, from the breach, creating a "gap" of sorts between what the consumer bargained for and what the consumer actually received. Only by receiving recompense to fill the gap will the consumer be restored to the position where he or she has the full benefit of his or her bargain—and be made whole. It is quite true that, in *Byers*, *Schroeder* and *Nobility Homes*, the products had actually malfunctioned.[27] It is also true that the seatbacks in the automobiles owned by the petitioner class have not malfunctioned as of the trial court's dismissal and apparently were being driven, albeit with a significant threat of bodily injury or death. Unlike general tort claims, however, the measure of injury in breach of contract claims is not bodily harm, nor is a consumer required to wait for a malfunction to occur as a

---

**27.** In *Byers,* to sell the motorcycles, as delivered, without the certifications would have exposed the petitioner to liability for violating federal law. The lack of certifications might as well have been faulty brakes or a cracked steering column in that their absence rendered the bikes useless. Similarly, in *Schroeder* and *Nobility Homes,* the mobile homes actually malfunctioned—spurring the consumers in that case to make repairs.

result of a product defect in order to assert an articulable injury. The paramount issue, rather, in breach of warranty claims, is whether the goods sold by a merchant are fit for their particular purpose, and in the case of automobiles, if they are safe for driving under reasonable circumstances. The injury becomes the loss the petitioner experienced as a result of the respondents' "nonconformity of tender." *See* Commercial Law § 2–714. The objective determination of the cost of that injury will always, at the very least, be the measure of difference between value of the goods if the petitioner had received them as warranted and the value of the goods as received with the defect. The only thing that will change, from case to case, will be the tool used to measures the damages. In this case, the tool the petitioners have chosen is the objective cost to repair the seatbacks. That certainly comports with § 2–714's requirement that the measure of damages be "determined in any manner which is reasonable."

In fact, on previous occasions, this Court has announced a preference for contract-based warranty claims when the only injury alleged is economic loss. *A.J. Decoster Co. v. Westinghouse Electric Corp.*, 333 Md. 245, 251, 634 A.2d 1330, 1332 (1994) (holding that "generally, the only recovery for a purely economic loss would be under a contract theory."); *Morris v. Osmose Wood Preserving, supra*, 340 Md. at 531–32, 667 A.2d at 631 (holding that economic losses "are often the result of some breach of contract and ordinarily should be recovered in contract actions, including actions based on breach of implied or express warranties.").

As we have stated, economic loss includes loss of value or use of the defective product, the absorption or future absorption of the cost to repair a defective product, or the loss of profits resulting from the loss of use of the product. *Gypsum*, 336 Md. at 156, 647 A.2d at 410 (1994). *Decoster*, 333 Md. at 249–50, 634 A.2d at 1332. In this case, the only hurdle the petitioners must surmount is whether the cost to repair the defective setbacks is a cognizable economic loss. So long as all of the other elements have been pled sufficient-

ly, actual present injury is not required to assert a claim for breach of implied warranty; economic loss, the cost to remedy the defect, is an "injury."

The respondent points us to a gaggle of other cases in which courts have held that, absent actual injury, harm to property, or product malfunction, a plaintiff can not recover for economic losses under the legal theories claimed in the case sub *judice.* See *e.g. Williamson v. Indianapolis Life Ins. Co.,* 741 So.2d 1057, 1061 (Ala.1999) (holding that, notwithstanding the defendant life insurance company's assurances that the plaintiff would not have to make premium payments after 10 years, the fact that the plaintiff would, at some future date, *likely* have to pay premiums beyond that time period, was not enough to constitute damages to state a claim for fraud); *Yu v. IBM,* 314 Ill.App.3d 892, 247 Ill.Dec. 841, 732 N.E.2d 1173, 1177 (2000) (holding that mere speculation that software the defendant sold the plaintiff *might* not work after December 31, 1999, did not amount to an injury for the purposes of plaintiff class' consumer fraud, deceptive trade practices and negligence claims); *Eddings v. Board of Educ.,* 305 Ill.App.3d 584, 238 Ill.Dec. 798, 712 N.E.2d 902, 908 (1999) (holding that the plaintiff, who was terminated from his position at a school, had not sufficiently pled damages, in the form of lost interest on his tax-sheltered annuities when he failed to establish that he had made contributions to the fund); *Capital Holding Corp. v. Bailey,* 873 S.W.2d 187, 197 (Ky.1994) (holding that plaintiff's allegation of actual injury in the form of "increase[d] risk of future injury or disease and severe emotional distress from the fear of developing cancer" as a result of exposure to asbestos while working in the defendant's building was too speculative to allege an actionable present injury on a theory of negligence.); *Lavelle v. Owens–Corning Fiberglas Corp.,* 30 Ohio Misc.2d 11, 507 N.E.2d 476, 479 (1987) (declining to permit plaintiff's recovery for emotional suffering as a result of his fear that his asbestosis would eventually cause him to become afflicted with cancer when cancer was not a result of asbestosis and plaintiff could not prove that it was more likely than not that he would contract cancer); *Briehl v. General*

*Motors Corp.,* 172 F.3d 623, 627–29 (8th Cir.1999) (holding that plaintiffs, alleging damages in the form of the lost retail value and overpayment for their vehicles, which contained ABS brake systems that caused drivers to overreact to the mechanism in a dangerous manner, did not adequately plead an actionable injury when brakes in the class vehicles had not malfunctioned and where plaintiffs had not sufficiently alleged a manifest defect); *Carlson v. General Motors Corp.,* 883 F.2d 287, 297 (4th Cir.1989) (declining to extend recovery under the UCC implied warranty of merchantability to plaintiff who claimed their G.M. vehicles contained a defect that cause frequent break downs and repairs when those vehicles "have served the traditionally recognized purpose for which automobiles are used," and that "the implied warranty of merchantability is simply a guarantee that they will operate in a 'safe condition' and 'substantially free of defects' ") (quoting *Overland Bond & Investment Corp. v. Howard,* 9 Ill.App.3d 348, 352, 353, 292 N.E.2d 168, 172–73 (1972)); *Spuhl v. Shiley, Inc.* 795 S.W.2d 573, 580 (Mo.App.E.D.1990) (holding that plaintiff's allegation that the prosthetic heart valves he received from the defendant caused him injury was insufficient to withstand dismissal of his strict liability products defect claim when he did not allege that the heart valves actually malfunctioned).

These cases are distinguishable from the case at bar. In the majority of these cases, the courts held that the injury alleged by the plaintiffs was merely speculative. In other words, the alleged injury, in those cases, constituted nothing more than *potential* injury in the future or a purely speculative fear of such injury. In none of the cases cited by the respondents was there an indication or discussion of whether the plaintiffs submitted any objective facts that a significant number of others had been injured or harmed as a result of the product defect. Indeed, without objective evidence of the likelihood of injuries, as measured by empirical or anecdotal evidence of actual injuries resulting from the defective seatbacks in this case, we would likely determine that the petition-

ers had not articulated a sufficient injury to withstand dismissal of their claims.

The respondent also points to a significant amount of case law from other jurisdictions that have found, in automobile product defects cases, that an allegation of economic loss is not sufficient to articulate an injury for the claims asserted by the petitioner in this case. Most notably, the respondents refer us to four cases from different jurisdictions including: *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 741 N.Y.S.2d 9 (N.Y.App.Div.2002); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96 (S.D.N.Y.1997); *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 44 Cal.Rptr.2d 526 (1995); and *Ford Motor Co. v. Rice*, 726 So.2d 626 (Ala.1998).

In *Frank*, a case similar to the one at bar, the plaintiffs alleged that the seatbacks in the class vehicles were defective and brought suit against car manufacturers, including counts sounding in negligence, strict liability, breach of implied warranty of merchantability, negligent concealment and misrepresentation, fraud and unfair or deceptive trade practices. The court held that because

> "plaintiffs have not been involved in any accidents and have not suffered any personal injuries or property damages ... [and because] plaintiffs do not allege that any seat has failed, been retrofitted or repaired, nor have plaintiffs attempted to sell or sold an automobile at a financial loss because of the alleged defect[, w]e find, therefore, that the motion court properly dismissed [the plaintiffs'] causes of action as a result of [their] failure to plead any actual injury." [28]

*Frank*, at 17. Similarly, in *Rice*, the plaintiffs in a class action suit alleged that their vehicles contained a defect that increased their propensity to roll over and thus, they were entitled to recover economic losses quantified by the lost value

---

**28.** The court in *Frank*, also dismissed the plaintiffs' seventh count of civil conspiracy because the plaintiffs had failed to allege any underlying tortious cause of action and "no independent cause of action exists for such a claim." *Id.* at 17.

of, and cost to repair their vehicles. The Supreme Court of Alabama held that the plaintiffs could not recover solely on the theory "that their vehicles could malfunction in the future, given the lack of any claims indicating manifest injury." *Ford Motor Co. v. Rice*, 726 So.2d at 628.

Similarly, in *American Suzuki*, in which the plaintiffs claimed, inter alia, that the defendant car manufacturer breached the implied warranty of merchantability when it sold them vehicles that had a tendency to roll over, the California Court of Appeals for the Second District, Division 2, held that, because the plaintiffs had not been injured or suffered any property damage, and because evidence proved that the "vast majority of vehicles sold during the class period have, since the date of purchase, provided basic transportation without manifesting the alleged rollover defect," 44 Cal.Rptr.2d at 528. the plaintiffs could not recover the cost to repair the defective vehicles. *Id.*

In *Weaver*, the plaintiffs, owners of vehicles with an allegedly defective integrated child safety seat, filed suit against the car manufacturer, Chrysler Corp. for fraud, negligent misrepresentation, violation of New York's Consumer Protection Act and breach of warranty. *Weaver*, 172 F.R.D. at 98. The United States District Court for the Southern District of New York held that the plaintiffs could not recover on any of their claims because they failed to sufficiently plead damages. *Id.* at 99. The Court elucidated "[i]t is well established that '[p]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.'" *Id.*, quoting *Hubbard v. General Motors Corp.*, 1996 WL 274018 at 3 (S.D.N.Y. May 22, 1996).

These cases, however, differ from the matter sub *judice*, in a significant way, in that the parties did not argue, and the court never addressed whether the harm alleged, in those cases, was sufficiently grave, or whether the likelihood of injury so great, to reach the threshold of the economic loss exception.

As we stated above, Maryland has joined those jurisdictions that recognize an exception to the rule which bars economic loss in tort. As we have seen, the reasoning behind the exception is that the likelihood is so great that severe bodily harm or death will result from the product defect, that we substitute actual present injury or product malfunction with the cost to repair the problem. Assuming that plaintiffs can adequately prove the substantive elements of their claims and objectively quantify the measure of their damages, Maryland has determined that the exception to the economic loss rule advances the practical goal of providing a remedy *before* the significant loss of life or limb. To be sure, in light of the general distaste for awarding economic losses in tort, if a petitioner has presented enough facts to qualify for the exception to the rule, then he or she has surmounted the greatest hurdle for pleading injury and this court cannot fathom why such economic losses would not qualify as a sufficient injury, or in the case of the Consumer Protection Act, loss for the purpose of pleading those claims.

Accordingly, this Court finds that the petitioner sufficiently pled the existence of a cognizable injury to withstand dismissal for failure to state a claim for each of its substantive counts, and we, therefore, reverse the dismissal of the petitioners' claims.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.

ELDRIDGE, J., Concurs.

ELDRIDGE, J., concurring:

I join both the judgment of the Court and the Court's opinion. I note, however, that I continue to adhere to the

**172**

dissenting opinions in *Morris v. Osmose,* 340 Md. 519, 547–555, 667 A.2d 624, 638–642 (1995) (Eldridge, J., joined by Bell and Raker, JJ., dissenting), and *Citaramanis v. Hallowell,* 328 Md. 142, 165–181, 613 A.2d 964, 975–983 (1992) (Bell, J., joined by Eldridge, J., dissenting).